859 P.2d 131

**STATE of Arizona, Appellee,**

v.

**William Diaz HERRERA, Jr., Appellant.**

**No. CR–89–0371–AP/PC.**

Supreme Court of Arizona,
En Banc.

March 4, 1993.

Reconsideration Denied May 4, 1993.

Certiorari Denied Nov. 1, 1993.

See 114 S.Ct. 398.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Div., Phoenix, for the State.

Martin, Hart & Fullerton by James R. Hart, II, Mesa, for appellant.

## OPINION

JAMES DUKE CAMERON, Justice (Retired).

In October 1989, a Maricopa County jury convicted defendant William Diaz Herrera, Jr. of first degree felony murder, aggravated robbery, and kidnapping. The trial court sentenced defendant to death on the murder conviction, to 10 years' imprisonment on the aggravated robbery conviction, and to life imprisonment on the kidnapping conviction, the sentences to run consecutively.

Defendant's first degree felony murder conviction and death sentence are automatically appealed to this court. *See* A.R.S. § 13–4033; rules 26.15, 31.2(b) and 31.-15(a)(3), Arizona Rules of Criminal Procedure. In addition, defendant timely appealed his aggravated robbery and kidnapping convictions and their respective sentences. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035.

## DISPOSITION

Based on our analysis below, we affirm defendant's convictions and sentences.

## ISSUES PRESENTED

Defendant raises the following issues on appeal:

### Trial Issues

1. Did the trial court err by failing to grant defendant's motion for judgment of acquittal on the felony murder charge?

2. Does Arizona's felony murder rule unconstitutionally presume a culpable mental state or did the trial court's felony murder instructions unconstitutionally allow the jury to presume a culpable mental state?

3. Did the trial court err by refusing to admit into evidence Ruben Herrera's out-of-court statement?

4. Did the trial court err by giving insufficient consideration to the effect on defendant of his alcohol use and his consumption of alcohol prior to the murder?

 a. Did the trial court err by denying defendant's request for further medical tests pursuant to Ariz.R.Crim.P. 11?

 b. Did the trial court err by denying defendant a competent psychiatrist to assist him with the preparation of his trial?

 c. Did the trial court err by denying defendant's petition for post-conviction relief?

### Sentencing Issues

5. Did the trial court err by sentencing defendant to life imprisonment for his kidnapping conviction?

6. Did the trial court err by finding that this murder was committed in an especially heinous, cruel or depraved manner or by finding no mitigating circumstances sufficiently substantial to call for leniency?

## FACTS AND PROCEDURAL HISTORY

On the afternoon of June 30, 1988, defendant went driving with his father William Diaz Herrera, Sr. (Senior), his brothers Mickel and Ruben, and Mickel's girlfriend Mary Cardenas. The family travelled in two cars, a gold Plymouth Duster and a blue Chevrolet pickup. After purchasing beer and wine, they drove to a relatively isolated dirt road in southwest Phoenix where they stopped to allow the overheated Duster to cool down. They parked the cars side by side facing diagonally into some trees and bushes on the side of the road and began drinking, talking, and listening

to music. With the exception of Senior, each of the Herreras was under the age of 21. In his statement to police, defendant said that he consumed approximately one case of beer that day, as well as three-fourths of a bottle of wine.

At about 5:20 p.m., a motorist drove by and saw the two vehicles. Based on the positioning of the vehicles, he thought that an accident had occurred. Shortly thereafter, the motorist flagged down Deputy Sheriff Vernon Marconnet and told him what he had seen. Deputy Marconnet proceeded immediately to the scene.

Upon arriving at the scene, Deputy Marconnet radioed in that he had encountered a blue Chevy pickup, license 616–NE, a yellow Plymouth Duster, license PNA–877, and approximately 4 males. He parked his car behind the Duster and the pickup, got out of his car, and asked the men if there was a problem. Mickel responded that the Duster had overheated.

Deputy Marconnet then asked each of the Herreras for identification. Mickel replied that he could not show his identification because his wallet had been stolen. Similarly, defendant responded that he had lost his identification. Ruben complied with the request, and gave Deputy Marconnet his identification card.

When asked for his identification, Senior became belligerent, swore at Deputy Marconnet, told him that he had done nothing wrong, and that he knew the law and did not have to show any identification. Deputy Marconnet responded that if Senior did not want to show identification, he would have to "book" him. He then walked Senior over to the sheriff's car and placed him in the back seat.

After placing Senior in his car, Deputy Marconnet approached Ms. Cardenas, who was sitting in the pickup, and asked her to look for the vehicle's registration and to bring it to him when she found it. She immediately began searching through the glove compartment for the requested papers.

At trial, Mickel testified in his own behalf that while Deputy Marconnet was talking with Ms. Cardenas, defendant told Mickel that he was going to fight with Deputy Marconnet. Mickel also testified that defendant was "always resisting with cops and stuff." By his own admission, defendant was worried about being arrested and jailed because he had "tickets and stuff" and had jumped his Texas probation on burglary charges. He also admitted that they were originally just going to overpower Deputy Marconnet and handcuff him so they could get away.

Whatever the motivation or plan, when Deputy Marconnet walked back over to defendant and again requested his identification, defendant began to argue with him. The arguing quickly escalated into a scuffle. Defendant eventually grabbed Deputy Marconnet and hit him, causing him to stagger and fall "a little down." When Deputy Marconnet got back up, defendant hit him again. By this time, Ruben had let Senior out of the sheriff's car. Senior immediately joined the fray, kneeing or kicking Deputy Marconnet in the crotch and cussing at him.

At defendant's urging, Mickel managed to snatch Deputy Marconnet's revolver away from him and ordered him several times to get down on the ground. Defendant also managed to grab Deputy Marconnet's portable radio, which he threw at the deputy because "[his] dad told [him] to throw it...." The blow from the radio caused a deep gash on Deputy Marconnet's forehead.

At this point, Deputy Marconnet was supine, and Mickel was pointing the revolver down at him. Defendant told police that Deputy Marconnet had his hands in front of his face and was pleading, "oh, please, don't, don't." Mickel stated that Deputy Marconnet looked like he wanted to get up and his expression seemed to say, "Just put it down." Defendant estimated that Deputy Marconnet lay in this position for 18 seconds before the shot was fired. According to Mickel, up to three minutes elapsed from the time he stole the weapon to the time Deputy Marconnet was shot.

The trial produced conflicting stories about what happened next. Ms. Cardenas testified that as she was leaning over in the pickup looking through the glove compartment, she heard Mickel say "freeze." She immediately sat up and saw him pointing the gun at Deputy Marconnet while defendant shouted, "shoot him, shoot him." While her view was somewhat limited because of the positioning of the vehicles, Ms. Cardenas testified that she saw Mickel shoot Deputy Marconnet. Mickel's first two interviews with investigators on July 1, 1988, are largely consistent with this version of the shooting.

During his third interview and at trial, however, Mickel's story changed. He testified that after he refused to shoot Deputy Marconnet, Senior took the gun from Mickel, shot Deputy Marconnet, and then handed the gun back to Mickel, telling him to "get rid of it." When questioned about the conflicting stories, Mickel testified that during his first two interviews, "I didn't know what I was thinking; I was confused."

Under either version of the crime, defendant's actions are not disputed. Defendant ultimately admitted to police that he said "shoot him" either once or twice before the shot was fired. Both Ms. Cardenas and Mickel substantiate that defendant urged Mickel to shoot Deputy Marconnet. Further, there was no dispute at trial about defendant's active role in the crime. He admits to hitting and fighting with the deputy, and then taking and throwing the deputy's radio at him.

After the shooting, the family fled the crime scene in the two vehicles. Defendant absconded with Ruben and Senior in the Duster, and headed toward Casa Grande. As they drove along the interstate, a tire blew. Defendant and Ruben then separated from Senior and spent the night wandering before going to the Casa Grande hospital. From there, defendant called the police and turned himself in.

Physical evidence adduced at trial shed further light on the events surrounding the murder. Consistent with statements and testimony that Ruben let Senior out of the sheriff's car, investigators found Ruben's fingerprint on the right rear door of the car. Investigators also confirmed that a scuffle had taken place by reference to numerous footprints and scuff marks found at the scene and Deputy Marconnet's portable radio found 12 to 13 feet away from his body in some grass or brush. Similarly, Deputy Marconnet's clothes were dirty and disheveled, his metal name plate was bent, and his sunglasses were on the ground about 8 feet away from his body.

The medical examiner testified that Deputy Marconnet died from a gunshot to the right eye at close range. He also found powder burns on Deputy Marconnet's hands, which indicated that they were in front of his face when the shot was fired.

Defendant was indicted, along with Mickel and Senior, on one count of first degree murder, one count of aggravated robbery, and one count of kidnapping. Defendant and Mickel were tried together. Senior's trial, which had been severed from his sons', took place later.

Prior to trial, defendant filed a Rule 11 motion for an examination of his mental condition. Before ruling on the motion, the court ordered a pre-screening to determine whether a complete examination was necessary. The pre-screening psychiatrist, Jack Potts, M.D., concluded that defendant was competent to stand trial and to assist in his own defense. Consequently, the court denied defendant's motion.

After the close of the evidence, the trial court instructed the jury on both felony and premeditated first degree murder. The felony murder was predicated upon aggravated robbery and/or kidnapping.

The jury convicted defendant of first degree felony murder, aggravated robbery, and kidnapping. Based on the jury's verdict, the trial court sentenced defendant to 10 years' imprisonment for the aggravated robbery conviction and to life imprisonment for the kidnapping conviction.

After holding an aggravation/mitigation hearing pursuant to A.R.S. § 13–703(B), the trial court found as an aggravating

circumstance that the murder had been committed in an especially heinous, cruel or depraved manner. A.R.S. § 13–703(F)(6). The trial court found as a statutory mitigating circumstance defendant's age of 20 years. A.R.S. § 13–703(G)(5). The court also considered two non-statutory mitigating circumstances: (1) defendant's dysfunctional family and deprived childhood, and (2) defendant's alcoholism. The trial court ultimately concluded that the mitigating circumstances did not outweigh the aggravating circumstance and that they were not sufficiently substantial to call for leniency. Based on this conclusion, the trial court sentenced defendant to death for the murder conviction.

Shortly after defendant was convicted, the trial court conducted an evidentiary hearing to consider two issues raised by defendant in a petition for post-conviction relief. Defendant claimed that (1) newly discovered evidence about his chronic alcoholism would mitigate his death sentence to life, and (2) his counsel was ineffective for failure to discover and present this and other evidence.

At the conclusion of the hearing, the trial court found that defendant had not met his burden of proof in establishing these claims by a preponderance of the evidence and subsequently denied defendant's petition. Defendant's rule 32.9 petition for review of this denial was consolidated with this appeal.

## DISCUSSION

### TRIAL ISSUES

I. *The Trial Court Properly Denied Defendant's Motion for Judgment of Acquittal on the Felony Murder Charge*

Defendant argues that the trial court erred by denying his motion for judgment of acquittal on the felony murder charge because the evidence was insufficient to warrant a conviction on the charges of aggravated robbery and kidnapping and, therefore, felony murder. He also argues that the trial court erred by denying his motion because Deputy Marconnet's death was not a result of actions to rob him.

Finally, defendant argues that the trial court erred by denying his motion because the crime of kidnapping merges into a subsequent murder and therefore may not be used as a basis for felony murder. We disagree with each of these arguments and hold that the trial court properly denied defendant's motion.

A criminal defendant is entitled to a judgment of acquittal only when "there is no substantial evidence to warrant a conviction." Rule 20, Arizona Rules of Criminal Procedure. A trial court thus has no duty to direct an acquittal where there is substantial evidence that a defendant has committed the crime charged, and an acquittal should not be directed if the evidence is such that reasonable minds may differ on the inferences to be drawn therefrom. *State v. Mincey*, 141 Ariz. 425, 432, 687 P.2d 1180, 1187 (1984). In this case, the state introduced substantial evidence that defendant committed both aggravated robbery and kidnapping.

A. The State Presented Substantial Evidence of the Aggravated Robbery Charge

■ Section 13–1902 defines "Robbery" as "taking any property of another from his person or immediate presence and against his will ... [and] threaten[ing] or us[ing] force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property." "Aggravated Robbery" is defined as "committing robbery as defined in § 13–1902, ... aided by one or more accomplices actually present." A.R.S. § 13–1903. Further, under § 13–303(A)(3), "[a] person is criminally accountable for the conduct of another if the person is an accomplice of such other person in the commission of an offense." "Accomplice" is defined as "a person ... who with the intent to promote or facilitate the commission of an offense [s]olicits or commands another person to commit the offense; or [p]rovides means or opportunity to another person to commit the offense." A.R.S. § 13–301(1), (3).

Under these statutes, then, to establish that defendant committed aggravated robbery, the state was required to prove the following 4 elements:

(1) property was taken from Deputy Marconnet's person;

(2) the property was taken against Deputy Marconnet's will;

(3) the property was taken by force and that the force was exercised with the intent to prevent resistance to the taking of the property; and

(4) the person taking the property was aided by a person who, with the intent to promote or facilitate the robbery, solicited or commanded another person to commit the robbery or provided means or opportunity to another person to commit the robbery.

Contrary to defendant's argument, the record clearly shows that the state introduced substantial evidence of each of these 4 elements in both the taking of Deputy Marconnet's gun and the taking of his portable radio.

### 1. *Deputy Marconnet's Gun*

Mickel testified that after defendant grabbed and hit Deputy Marconnet, and while defendant was wrestling with him, he told Mickel to "grab the gun." When Mickel did so, defendant's criminal liability for aggravated robbery was complete:

(1) property was taken from Deputy Marconnet's person—Mickel took Deputy Marconnet's gun out of his hand;

(2) Deputy Marconnet's gun was taken against his will—as Deputy Marconnet was reaching for his gun and while defendant was physically restraining him, Mickel took the gun out of Deputy Marconnet's hand;

(3) Deputy Marconnet's gun was taken by force and the force was exercised with the intent to prevent resistance to the taking of the gun—defendant grabbed and hit Deputy Marconnet and physically restrained Deputy Marconnet while Mickel took the gun—for the purpose of overpowering Deputy Marconnet. *See State v.*

*Bishop*, 144 Ariz. 521, 524, 698 P.2d 1240, 1243 (1985) (" 'Force' sufficient to constitute robbery may either be before, or at the time of the taking, and it must be of such a nature as to show that it was intended to overpower the party robbed."); and

(4) the person taking the property was aided by a person who, with the intent to promote or facilitate the robbery, solicited or commanded another person to commit the robbery—Mickel took Deputy Marconnet's gun and was aided by defendant who, intending that Mickel take the gun, told Mickel to grab the gun.

### 2. *Deputy Marconnet's Portable Radio*

Defendant admitted that he took Deputy Marconnet's portable radio from him. This admission is corroborated by Ms. Cardenas' testimony that defendant "grabbed [the radio] and just threw it at [Deputy Marconnet's] face on his right side." This evidence establishes defendant's criminal liability for aggravated robbery:

(1) property was taken from Deputy Marconnet's person—defendant took Deputy Marconnet's portable radio out of his hand;

(2) Deputy Marconnet's radio was taken against his will—defendant took it out of his hand while Mickel held the gun on Deputy Marconnet;

(3) Deputy Marconnet's radio was taken by force and the force was exercised with the intent to prevent resistance to the taking of the radio—again, defendant took the radio while Mickel held Deputy Marconnet at bay—for the purpose of facilitating their overpowering of Deputy Marconnet by preventing him from further communicating with fellow officers; and

(4) the person taking the property was aided by a person who, with the intent to promote or facilitate the robbery, provided means or opportunity to another person to commit the robbery—defendant took Deputy Marconnet's radio and was aided by Mick-

el who, intending that defendant take the radio, provided defendant with the opportunity to take the radio by holding the gun on Deputy Marconnet.

**B. The State Presented Substantial Evidence to Support the Kidnapping Charge**

■ Section 13–1304(A) defines "Kidnapping" in relevant part as follows:

A person commits kidnapping by knowingly restraining another person with the intent to:

. . . .

3. Inflict death [or] physical injury . . . on the victim . . .; or

4. Place the victim . . . in reasonable apprehension of imminent physical injury . . .; or

5. Interfere with the performance of a governmental . . . function.

Based on the trial court's instruction, which tracked § 13–1304(A) virtually verbatim, the jury found defendant guilty of kidnapping, but its verdict did not specify upon which subsection of the kidnapping statute it relied. Because the statute is worded in the disjunctive, however, the jury could have based its verdict on any *one* of these three subsections. *See State v. Bruni,* 129 Ariz. 312, 317, 630 P.2d 1044, 1049 (App.1981) (each of § 13–1304's subsections provides different way in which kidnapping may be committed). We find that the state introduced sufficient evidence to support defendant's kidnapping conviction under subsection 5 of the kidnapping statute.

Defendant is criminally liable as an accomplice for Mickel's restraint of Deputy Marconnet. Moreover, defendant admitted that he grabbed, hit, and wrestled with Deputy Marconnet and told Mickel to grab the deputy's gun so that Deputy Marconnet would not take defendant to jail. These actions clearly interfered with Deputy Marconnet's governmental function, which was to identify the Herreras and to determine what, if any, action he needed to take against them as a Deputy Sheriff.

In sum, the record shows that the state presented not only evidence substantial enough to preclude a judgment of acquittal on the felony murder charge, but it also presented sufficient evidence to support the jury's guilty verdict as to the aggravated robbery charge, the kidnapping charge, and the first degree felony murder charge. *See State v. Carter,* 118 Ariz. 562, 563, 578 P.2d 991, 992 (1978) (On appeal, we "consider the evidence in the light most favorable to the appellee [here, the state] and resolve all reasonable inferences against the appellant [here, the defendant]. Only if there is a complete lack of probative facts to support the verdict, will we reverse."). Therefore, the trial court did not err in denying defendant's motion for judgment of acquittal on the felony murder charge.

**C. The Facts of This Aggravated Robbery Provide a Proper Basis for Defendant's Felony Murder Conviction**

■ A person commits felony murder when, "[a]cting either alone or with one or more other persons, such person commits or attempts to commit [aggravated robbery], and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person." A.R.S. § 13–1105(A)(2). A death is "in furtherance" of an underlying offense if the death resulted from any action taken to facilitate the accomplishment of the felony. *State v. Hallman,* 137 Ariz. 31, 38, 668 P.2d 874, 881 (1983). This is ordinarily a question to be determined by the trier of fact. *Hallman,* 137 Ariz. at 38, 668 P.2d at 881.

We believe that the facts of this aggravated robbery provide a proper basis for defendant's felony murder conviction. As in this case, the crime of aggravated robbery may be a continuous crime. The robbery of Deputy Marconnet did not end either when Mickel had Deputy Marconnet's gun or when defendant had his radio. The express language of A.R.S. § 13–1902 extended the robbery up to and through Deputy Marconnet's murder. That section provides that a person commits robbery if in

the course of taking another's property such person uses force with intent "to prevent resistance to such person taking *or retaining* property." We understand the emphasized language to include within the definition of "Robbery" any and all force used by a person against one from whom property has been taken in an effort to retain that property. Accordingly, murdering Deputy Marconnet to prevent him from regaining his gun and arresting the Herreras was "in furtherance" of the aggravated robbery and therefore a proper basis for defendant's felony murder conviction.

### D. Kidnapping Does Not Merge Into a Subsequent Murder

■ Citing *State v. Essman,* 98 Ariz. 228, 403 P.2d 540 (1965), defendant argues that kidnapping merges into a subsequent murder and therefore may not be the basis for a felony murder conviction. Whatever the merits of this argument, if any, we find no error in this case.

The record establishes that the kidnapping and subsequent murder of Deputy Marconnet were not conceptually identical and did not occur as part of the same act. Rather, the kidnapping occurred when Deputy Marconnet was attacked and forced to lie on the ground. The murder occurred later, when defendant's order to shoot Deputy Marconnet was carried out. We hold that defendant's conviction for first degree felony murder was properly premised on kidnapping. *See State v. Herrera, Sr. I,* 176 Ariz. 9, 859 P.2d 119 (1993).

### II. *Both Arizona's Felony Murder Rule and the Murder Instructions Given in this Case Are Constitutional*

■ Defendant also argues that the Arizona felony murder rule is unconstitutional because it presumes a defendant has the intent to kill from a defendant's intent to commit the underlying felony. This court expressly rejected this argument in *State v. McLoughlin,* 139 Ariz. 481, 679 P.2d 504 (1984). We stated:

[C]ontrary to what appellant claims, the felony-murder rule does not allow the state to obtain murder convictions without any showing of *mens rea.* Before an accused can be found guilty of first-degree murder pursuant to the felony-murder rule the state must prove he or she committed one of the felonies enumerated in § 13–1105(A)(2). Though the felony-murder doctrine does not require a specific intent to kill to support a first-degree murder conviction, it does require proof of the mental state required for commission of the relevant felony.... [T]he *mens rea* necessary to satisfy the premeditation element of first-degree murder is supplied by the specific intent required for the felony.

*McLoughlin,* 139 Ariz. at 485–86, 679 P.2d at 508–09 (citations omitted). We reaffirm our holding in *McLoughlin.* Arizona's felony murder rule is not unconstitutional.

■ Defendant similarly argues that, in any event, his felony murder conviction is unconstitutional because the trial court gave an improper instruction to the jury. We do not agree.

The trial court gave the following instruction:

You *may infer* that the defendant intended to cause or knew he could cause, or attempt to cause death, the death of another person from the defendant's use of a deadly weapon or dangerous instrument, if you find that the killing was done without circumstances of legal justification or excuse, and done in such a way as it was likely to produce death.

(Emphasis added.) Defendant argues that this instruction shifted the burden of proof to the defendant by allowing the jury to infer intent from the use of a deadly weapon. We disagree.

■ We held in *State v. Jensen,* 153 Ariz. 171, 176, 735 P.2d 781, 786 (1987), *citing Sandstrom v. Montana,* 442 U.S. 510, 523–24, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979), that "[a]n instruction creating a presumption of malice that has the effect of shifting the burden of proof on intent to the defendant violates due process." The jury instruction given by the trial court does not, however, create such a presumption. The instruction given was permissive

rather than mandatory. Under the instruction, the jury may, but is not required to, infer intent to commit the offense from the possession of the gun. "[I]nstructions that create a permissive inference do not ordinarily shift the burden of proof because the state is still required to convince the jury that the suggested conclusion should be inferred based on the predicate facts proven." *State v. Cole,* 153 Ariz. 86, 89, 734 P.2d 1042, 1045 (App.1987). A permissive presumption will not affect the "beyond a reasonable doubt" standard unless the facts of the case suggest no rational way for the trier of fact to make the connection permitted by the inference. *Ulster County Ct. v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2225, 60 L.Ed.2d 777 (1979). We find no error.

### III. *The Trial Court Properly Refused to Admit Ruben Herrera's Out-of-Court Statement*

■ Defendant claims that the trial court erred by refusing to admit Ruben's purported out-of-court statement indicating that Senior shot Deputy Marconnet. Defendant argues that Ruben's statement is admissible as a hearsay exception under rule 804(b)(3), Arizona Rules of Evidence (statement against declarant's penal interest). We disagree.

"[A]dmission of evidence is within the trial court's discretion and will not be disturbed on appeal absent an abuse of discretion." *State v. LaGrand,* 153 Ariz. 21, 27, 734 P.2d 563, 569 (1987). The trial court did not abuse its discretion in this use.

Defendant's guilt in this crime is as an accomplice and is not controlled by whether Mickel *or* Senior fired the fatal shot. Even if Senior did shoot Deputy Marconnet, sufficient evidence in this record supports defendant's felony murder conviction as an accomplice. Thus, Ruben's statement indicating that Senior shot Deputy Marconnet is irrelevant in this case and its rejection was neither erroneous nor prejudicial. *See* rule 402, Arizona Rules of Evidence ("Evidence which is not relevant is not admissible.").

### IV. *The Trial Court Properly Ruled on Issues Stemming From Defendant's Alcohol Use*

Defendant raises three issues involving his alcohol use. First, defendant argues that the trial court improperly denied his request for further medical examination pursuant to rule 11, Arizona Rules of Criminal Procedure. Second, defendant argues that the trial court's failure to appoint a psychologist to assist with the preparation of his trial violated his federal constitutional rights under *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Third, defendant argues that his trial counsel's failure to develop evidence regarding defendant's admission to the Big Springs Mental Rehabilitation Facility constituted ineffective assistance of counsel. We reject each of these arguments.

### A. The Rule 11 Proceedings

■ A trial court in Arizona shall not proceed against anyone who is "unable to understand the proceedings against him or to assist in his own defense." Rule 11.1. Any party may request a competency examination if a defendant appears incompetent. Rule 11.2. If the trial court determines that reasonable grounds exist for an examination, at least two mental health experts are appointed to examine the defendant. Rule 11.3. "Prior to making the determination whether reasonable grounds exist, the trial judge may order a preliminary evaluation of the defendant." *State v. Walton,* 159 Ariz. 571, 577, 769 P.2d 1017, 1023 (1989), *aff'd Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *citing State v. Johnson,* 147 Ariz. 395, 398, 710 P.2d 1050, 1053 (1985).

The trial court ordered a preliminary evaluation of defendant by Jack Potts, M.D., the Assistant Clinical Director of Psychiatry at Correctional Health Services. Although Dr. Potts is an employee of the county, he is not affiliated with the Maricopa County Attorney's Office, and he is often consulted for unbiased evaluations. Dr. Potts examined defendant and found "no evidence that the defendant suffers from a mental illness" and recommended

that the court not grant defendant's motion for a more extensive evaluation pursuant to rule 11. The trial court concluded, within its discretion, that defendant was competent to stand trial. *See Walton,* 159 Ariz. at 577, 769 P.2d at 1023 (trial court's denial of motion for mental examination after defendant presented evidence of childhood history of psychiatric referrals and blackouts caused by substance abuse not an abuse of discretion). We find no error.

### B. The Trial Court Did Not Deny Defendant Any Federal Constitutional Right to Psychiatric Assistance at Trial

 Defendant asserts that as an indigent he is constitutionally entitled to "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096. Defendant misconstrues *Ake.*

A trial court is not required to appoint a psychiatrist unless the defendant intends to raise the issue of his mental condition at trial. *Ake,* 470 U.S. at 82–83, 105 S.Ct. at 1096. After the trial court denied defendant's rule 11 motion, defendant did not pursue the issue of his mental condition at either the trial or the sentencing hearing. Thus, *Ake* does not apply in this case.

 Moreover, Arizona precedent clearly supports the trial court's refusal to appoint a psychiatrist. Defendant's mental condition argument, although not entirely clear, appears to have been based on his alleged alcohol abuse/intoxication. As opposed to insanity—the mental condition at issue in *Ake* —the effect of alcohol intoxication and alcoholism are within the common knowledge and experience of the jury. *State v. Hicks,* 133 Ariz. 64, 71, 649 P.2d 267, 274 (1982). Therefore, the trial court reasonably denied defendant's motion.

Similarly, defendant's reliance on *Smith v. McCormick,* 914 F.2d 1153 (9th Cir. 1990), is misplaced. In *Smith,* the trial court found a threshold basis for further psychiatric examination, but did not appoint an independent expert to assist the defendant. The Ninth Circuit found that under such circumstances, the defendant must be appointed an adversarial psychiatrist.

The threshold basis in *Smith* was that the defendant had consumed approximately 40 "hits" of LSD in the 24–hour period before he committed multiple murders. No such threshold basis exists in this case. A detective testified that defendant told him that defendant drank approximately one case of beer and three-fourths of a bottle of wine. While we would agree that the effect of 40 "hits" of LSD in a 24–hour period provides a threshold basis for further examination, we do not believe that the effect of drinking beer and wine or the mere assertion of alcohol abuse does. *See State v. Rivera,* 152 Ariz. 507, 514, 733 P.2d 1090, 1097 (1987).

Consistent with our decision in *Walton,* 159 Ariz. at 577, 769 P.2d at 1023, we hold that

> Prior to making the determination whether reasonable grounds exist [for a psychiatric examination], the trial judge may order a preliminary evaluation of the defendant.

The trial court complied with this requirement and reasonably concluded that no grounds existed for further examination. We find no error.

### C. The Trial Court Properly Denied Defendant's Motion for Post-Conviction Relief

 Defendant argues in his rule 32 Petition for Post-Conviction Relief that he was provided with ineffective assistance of counsel because his trial lawyer failed to follow up on evidence that he had spent time in the Big Springs Rehabilitation Facility for treatment of his alcoholism. He reasserts this argument here. We are unpersuaded.

Defendant insists that his extreme consumption of alcohol influenced his judgment at the time the offense was committed and also impaired his ability to assist his trial counsel in preparing for trial. He argues that his prior history of alcoholic

blackouts and incarceration at the Big Springs facility should have alerted his attorney to further pursue this issue. His recall of the events at the scene of the offense and the assistance he provided to his trial counsel, however, suggest otherwise.

Defendant made several statements to the police upon his arrest. All of these statements, which are in large part corroborated by other evidence, demonstrate defendant's specific recall of the events giving rise to the charges against him. We find it curious that defendant did not declare his inability to recollect the events of 30 June 1988 until his post-conviction relief hearing, where he testified that he had actually blacked out at Carver Road and his statements to the police about the shooting were based on what Ruben had told him.

Defendant also dismissed his stay at the Big Springs facility as insignificant by telling his trial counsel that it related to his consumption of alcohol. This evidence is not new because defendant was aware of it during the entire proceeding. Trial counsel was not ineffective for failing to develop this evidence further.

SENTENCING ISSUES

V. *The Trial Court Properly Sentenced Defendant to Life Imprisonment for his Kidnapping Conviction*

■ Defendant contends that the trial court abused its discretion by sentencing him to an enhanced term of life imprisonment pursuant to A.R.S. § 13–604.02(A) for his kidnapping conviction. This statute provides that "a person convicted of any felony offense involving ... the intentional or knowing infliction of serious physical injury upon another ... if committed while the person is on probation for a conviction of a felony offense ... shall be sentenced to life imprisonment...." Defendant maintains that the trial record does not provide sufficient evidence to support a finding that defendant is the same person referred to in the certified documents used to establish that defendant was on probation for a felony burglary offense committed in Big Springs, Texas at the time of Deputy Marconnet's kidnapping and murder. We disagree.

The finding required for purposes of enhancing a defendant's sentence under A.R.S. § 13–604.02 must be supported by reasonable evidence. *See State v. Turner,* 141 Ariz. 470, 475, 687 P.2d 1225, 1230 (1984); *State v. Rickman,* 148 Ariz. 499, 504, 715 P.2d 752, 757 (1986). In making this finding, the trial court may "consider all evidence and information presented at all stages of the trial together with all probation and presentence reports." *Turner,* 141 Ariz. at 475, 687 P.2d at 1230, *quoting State v. Meador,* 132 Ariz. 343, 346–47, 645 P.2d 1257, 1260–61 (App.1982). Based on the material available to the trial court, we believe that defendant's sentence was properly enhanced under A.R.S. § 13–604.02.

The state submitted to the jury certified copies of defendant's prior conviction and arrest warrant issued upon defendant's violation of his Texas probation. This evidence demonstrates that defendant was on probation when Deputy Marconnet was kidnapped. Defendant also admitted to police during his July 1, 1988 statement that he was on probation in Big Springs, Texas for burglary. This evidence is sufficient to establish that defendant was subject to the terms of the enhancement provision when he kidnapped Deputy Marconnet.

VI. *The Trial Court Properly Found One Aggravating Circumstance and No Mitigating Circumstances Sufficiently Substantial to Call for Leniency*

A. Deputy Marconnet's Murder was Committed in an Especially Heinous, Cruel or Depraved Manner

■ This court independently reviews the record in all death penalty cases to establish the presence or absence of aggravating circumstances and to determine whether the state proved the existence of those circumstances beyond a reasonable doubt. *State v. LaGrand,* 153 Ariz. 21, 34, 734 P.2d 563, 576 (1987). We now undertake this review.

**34**

The sentencing judge found that Deputy Marconnet's murder was committed in an especially heinous, cruel or depraved manner pursuant to A.R.S. § 13–703(F)(6). Defendant argues that this finding is erroneous because it is not supported by the evidence produced at trial. The statute is worded in the disjunctive; therefore, we need only find one of the three circumstances to uphold the trial judge's finding. *State v. Robinson*, 165 Ariz. 51, 60, 796 P.2d 853, 862 (1990), *cert. denied*, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1195 (1991); *State v. Libberton*, 141 Ariz. 132, 139, 685 P.2d 1284, 1291 (1984). We find that this murder was committed in an especially cruel manner.

"[A] crime is committed in an especially cruel manner when the [defendant] inflicts mental anguish or physical abuse before the victim's death." *Walton*, 159 Ariz. at 586, 769 P.2d at 1032. "[W]hether the murder involved cruelty is a question that focuses on the victim and his feelings before he died." *State v. Castaneda*, 150 Ariz. 382, 393, 724 P.2d 1, 12 (1986). "A victim's certainty or uncertainty as to his or her ultimate fate can be indicative of cruelty and heinousness." *State v. Gillies*, 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984).

The record shows that after the deputy's gun was taken, defendant grabbed and then threw Deputy Marconnet's portable radio at him, causing a deep gash in his forehead. Deputy Marconnet was then forced to lie on his back while defendant shouted "shoot him" at least once. Deputy Marconnet was subjected to this treatment for a period of 18 seconds to two or three minutes.

Defendant himself admitted that before the shooting, Deputy Marconnet pulled his hands in front of his face in a pleading position and pleaded, "Oh, please, don't, don't." This admission was corroborated by evidence that Deputy Marconnet had powder burns on his hands. Based on the record, we conclude that Deputy Marconnet endured not only physical abuse, but unimaginable mental anguish immediately before his being shot through the right eye.

We also agree with the trial judge's finding under *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), that the defendant was an active participant in the murder and intended to kill Deputy Marconnet. Thus, no constitutional barrier exists to prevent the trial judge from sentencing defendant, who was convicted of felony murder, to death.

We do *not* consider A.R.S. § 13–703(F)(10) (murder of peace officer) as an aggravating circumstance because its effective date was *after* Deputy Marconnet's murder. Laws 1988, Ch. 155, § 1.

B. The Mitigating Circumstances Established by Defendant Are Not Sufficiently Substantial to Call for Leniency

This court must independently review the record and determine whether the mitigating circumstances outweigh the aggravating circumstances. *State v. Stevens*, 158 Ariz. 595, 598, 764 P.2d 724, 727 (1988); *State v. Nash*, 143 Ariz. 392, 404, 694 P.2d 222, 234 (1985). Defendant must prove mitigating circumstances by a preponderance of the evidence. *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990). When sentencing a defendant for first degree murder, the trial judge must consider, in addition to the circumstances set out in A.R.S. § 13–703(G), any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less severe than death is appropriate. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Fierro*, 166 Ariz. at 551, 804 P.2d at 84.

The trial judge reviewed the evidence and found one statutory mitigating circumstance—defendant's age of 20 years, A.R.S. § 13–703(G)(5)—but held that it was insufficient to call for leniency. The trial judge properly discounted defendant's youth in this case because of the extent and degree of his participation in Deputy Marconnet's murder. *See State v. Correll*, 148 Ariz. 468, 482, 715 P.2d 721, 735 (1986) ("When age is offered as a mitigating cir-

cumstance, its weight may be discounted by the extent and duration of defendant's participation.").

Defendant argues that the trial judge improperly rejected two additional statutory mitigating circumstances. First, the defendant asserts that although he was legally accountable for the conduct of Mickel pursuant to A.R.S. § 13–303, his participation in the homicide was relatively minor. *See* A.R.S. § 13–703(G)(3) (defendant legally accountable for conduct of another but his participation in the offense was relatively minor). We disagree.

■ Defendant was not a minor participant in these events. He and his brother Mickel purposely attacked Deputy Marconnet and disarmed him. The two of them together committed the aggravated robbery. Then, after Mickel gained control of the gun and held it on Deputy Marconnet, defendant shouted "shoot him" to encourage Mickel to follow through on the crime. We find no error.

■ Second, defendant asserts that because of his consumption of alcohol, his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. *See* A.R.S. § 13–703(G)(1). The trial judge found that although defendant "had participated along with the other defendants in the consumption of beer, ... this consumption was not sufficient to impair [the defendant's] ability to form the prerequisite intent which is a necessary element to be proven to sustain his conviction of the offense charged." He therefore refused to find the A.R.S. § 13–703(G)(1) mitigating circumstance. This conclusion is consistent with this court's holding in *State v. Wallace I*, where we stated:

> The fact that a defendant was to some degree intoxicated is not, by itself, a mitigating circumstance. Whether the defendant's intoxication was a mitigating circumstance such as would make imposition of the death penalty for homicide inappropriate depends upon whether his capacity to appreciate the wrongfulness

of his conduct or to conform his conduct to requirements of law was significantly impaired.

*Wallace I,* 151 Ariz. 362, 369, 728 P.2d 232, 239 (1986), *quoting State v. Woratzeck,* 134 Ariz. 452, 458, 657 P.2d 865, 871 (1983). While the trial judge refused to find defendant's alcohol consumption to be a statutory mitigating circumstance, he did find it to be a non-statutory mitigating circumstance and gave it mitigating weight. The evidence introduced at trial supports this finding.

The evidence shows that the defendant was drinking before Deputy Marconnet approached him. No evidence, however, suggests that defendant was impaired at all, let alone significantly. Rather, defendant demonstrated a good memory for the events that occurred. He related these events to the arresting officers the day after the murder and assisted his attorney in preparing his defense. It was not until his post-conviction relief hearing that defendant asserted that he could not remember the events of 30 June 1988, and that his earlier statements were based upon what Ruben related to him while they were fleeing.

■ Based upon our independent review of the record and the aggravating and mitigating circumstances, we believe that the trial judge gave appropriate mitigating weight to each and every mitigating circumstance proved by defendant and correctly found that they were not sufficiently substantial to outweigh the aggravating circumstance and that they were not sufficiently substantial to call for leniency.

C. Proportionality Review

■ Defendant argues that a proportionality review is required in all death penalty cases. Such a review is no longer necessary. *State v. Salazar,* 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992).

DISPOSITION

We have searched the record for fundamental error as required by A.R.S. § 13–4035, but have found none. Defendant's

convictions and sentences are therefore affirmed.

FELDMAN, C.J., MOELLER, V.C.J., CORCORAN, J., and FRANK X. GORDON, Jr., J. (Retired), concur.

NOTE: Justices THOMAS A. ZLAKET and FREDERICK J. MARTONE did not participate in the determination of this matter.