64 P.3d 191

STATE of Arizona, Appellee,

v.

Arthur Larry LUCERO, Appellant.

No. 1 CA–CR 02–0431.

Court of Appeals of Arizona,
Division 1, Department B.

Feb. 11, 2003.

Review Denied May 28, 2003.

Terry Goddard, Attorney General, By Randall M. Howe, Chief Counsel, Criminal Appeals Section and Joseph T. Maziarz, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Michael J. Dew, Phoenix, Attorney for Appellant.

**OPINION**

SULT, Judge.

¶ 1 Defendant Arthur Larry Lucero appeals his convictions for two counts of first-degree murder. For the following reasons, we reverse the conviction based on premedi-

tated murder, but affirm both convictions of felony murder.

## BACKGROUND

¶ 2 Leroy Campbell, Sergio Martinez, and Defendant robbed a jewelry store at approximately 11:45 a.m. on April 16, 1999. Two employees of the store, one working inside the store and one who was outside in the parking lot, called 911 as the robbery took place. One employee described the getaway car, a black Mustang, to the 911 operator as the suspects drove away.

¶ 3 A police officer was across the street from the jewelry store when he saw the Mustang. Having just heard a report of the robbery, he immediately began pursuit, and was soon joined by another officer. They attained speeds of up to 100 m.p.h. Near the end of the chase, they temporarily lost sight of the Mustang. However, because of traffic congestion ahead of them, they determined the suspects had either pulled into a restaurant parking lot or into an apartment complex across the street from the restaurant. Because persons in the restaurant parking lot informed the officers they had not seen a black Mustang, the officers went across the street to the walled and gated apartment complex. The officers discovered that the Mustang had entered the complex from a resident who had witnessed it entering at a high rate of speed. The resident opened the gate and showed the officers which way the Mustang had gone.

¶ 4 Approximately seven minutes passed from the time the pursuit began until the Mustang was found. Following the route of the chase, the distance from the jewelry store to the apartment complex was 2.9 miles. The Mustang was found in the complex with the engine running and the doors open. Once the Mustang was found, other officers began to arrive, and they began to set up a perimeter around the complex.

¶ 5 The Mustang left seventy-five foot skid marks when it came to a stop. Jewelry, jewelry tags, and jewelry stands from the store were found in the Mustang. A piece of a broken pistol grip was found on the ground next to the Mustang.

¶ 6 A Special Assignment Unit, or "swat team," was called at approximately noon. Members of the swat team first helped remove a handicapped person from the complex. At approximately 1:30 to 1:45 p.m., the swat team began their search of the complex, apartment by apartment. When they arrived at unit 1055, they found the sliding glass door was shattered. Upon their entry into unit 1055 at approximately 3:00 p.m., Martinez, the only suspect inside, opened fire on the officers. In the ensuing gun battle, Martinez and Officer Snedigar were killed. The broken pistol grip found by the Mustang matched a weapon found in unit 1055.

¶ 7 After the gun battle, law enforcement officers continued to search the complex for the other suspects. Every person found in the complex and every vehicle leaving the complex was challenged and checked by police officers. During the search, the sliding glass door to apartment 1086 was found to have been broken and the screen door was missing. Before the unit was searched, Defendant and Campbell were seen outside 1086 and subsequently taken into custody.

¶ 8 When unit 1086 was investigated, the damaged screen door was found to have been taken inside the apartment into the kitchen. Defendant's fingerprints were found on the screen door. Items in the apartment had been moved since the family had left that morning. A claw hammer, like that used to smash open a display case in the jewelry store, was found inside but did not belong to the residents. A briefcase had been broken into. A disposable razor and an electric razor has been used since the family left. A syringe that did not belong to the residents was hidden behind a television. A holster, ammunition magazine and a fully loaded semi-automatic rifle, none of which belonged to the residents, were found hidden in a child's room. Men's clothing which did not belong to the residents was found in the apartment, and Defendant and Campbell were wearing clothing taken from unit 1086 when they were apprehended.

¶ 9 A "trail" of stolen jewelry was found between the Mustang and unit 1086. Jewelry taken in the robbery was found under a mattress in unit 1086. More jewelry taken

during the robbery was found outside unit 1086 on the patio. The distance from the Mustang to unit 1086 was 144 feet. There is conflicting testimony regarding exactly when Defendant and Campbell were captured. However, it is known that they were taken into custody after the gun battle, and that there was a notification at approximately 3:45 p.m. that they were being brought in for questioning.

¶ 10 Defendant was charged with two counts of first-degree murder, one count of armed robbery, and one count of first-degree burglary. Because Defendant did not participate in the gun battle which resulted in the deaths, he was charged with the murders as an accomplice. Count 1 charged him with the death of Chandler Police Officer James Snedigar under theories of felony murder and, alternatively, premeditated murder. Count 2 charged Defendant with felony murder for the death of Martinez, who had been shot by police. Defendant waived his right to a jury, and the trial court found him guilty on all counts. The court specifically found Defendant guilty of Count 1 under theories of both felony and premeditated murder.

## ISSUES

¶ 11 Defendant raises no issue regarding his convictions for armed robbery or first-degree burglary. However, Defendant contends there is insufficient evidence to support his convictions for first-degree murder.

## ANALYSIS

### Premeditated Murder

¶ 12 Defendant first argues that pursuant to the recent decision in *State v. Phillips*, 202 Ariz. 427, 46 P.3d 1048 (2002), there is insufficient evidence using accomplice liability to convict him for the premeditated murder of Officer Snedigar. In *Phillips*, our Supreme Court held that a defendant may be held criminally liable as an accomplice only for those offenses which the defendant intended to aid or actually aided another in planning or committing. *Id.* at 436, 46 P.3d at 1057. The State concedes there is no evidence Defendant either intended to aid or actually aided in the planning or commission

of the murder of the officer, and the State therefore agrees that pursuant to *Phillips*, Defendant may not be convicted for the premeditated murder of Officer Snedigar based on accomplice liability. We reverse Defendant's conviction for Count 1 based on the theory of premeditated murder.

### Felony Murder

¶ 13 Defendant next contends there is insufficient evidence to support a conviction for felony murder of either Officer Snedigar or Martinez. "A person commits felony murder when, 'acting either alone or with one or more other persons, such person commits or attempts to commit [armed robbery], and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person.' " *State v. Herrera*, 176 Ariz. 21, 29, 859 P.2d 131, 139 (1993)(citing Arizona Revised Statutes ("A.R.S.") § 13–1105(A)(2)). If a death results from any action taken to facilitate the accomplishment of the underlying offense, that death is "in furtherance" of the underlying offense. *Herrera*, 176 Ariz. at 29, 859 P.2d at 139. Whether a death is "in furtherance" of the underlying offense is ordinarily a fact question. *Id.* Whether a death occurred during "immediate flight" from the underlying offense is, likewise, a fact question. *State v. Jimenez*, 130 Ariz. 138, 141, 634 P.2d 950, 953 (1981).

¶ 14 Defendant argues that given the sequence of events and the passage of time, neither death occurred during immediate flight. Defendant argues that hours had passed between the events, that he was no longer in immediate flight, that he was hiding rather than fleeing, and that the officers were searching rather than pursuing. Defendant further argues that he had "reached a place of temporary safety" which terminated any flight. In short, Defendant argues the causal chain between the underlying offense and the deaths had been broken.

¶ 15 There is little Arizona law to guide the determination of whether a death occurred during immediate flight from the offense. As far as Arizona law regarding felony murder, the parties identify those same general

provisions cited above, as well as fact-specific cases that are not analogous to these facts. Defendant's argument focuses on whether there is sufficient evidence the deaths occurred during immediate flight from the robbery. Acknowledging the dearth of Arizona law on the subject, the parties cite secondary sources and cases from other jurisdictions regarding flight and temporary safety.

¶ 16 No Arizona case has adopted the doctrine that flight ends when a suspect has reached a place of temporary safety. Cases from other jurisdictions which discuss the element of temporary safety merely emphasize the fact-specific nature of the inquiry, and that temporary safety may be only one factor in the inquiry. In *People v. Thongvilay*, 62 Cal.App.4th 71, 72 Cal.Rptr.2d 738 (1998), the California Court of Appeals stated that in the context of "temporary safety," the rule is stated in terms of whether the defendant actually reached a place of temporary safety, rather than whether the defendant believed he reached a place of temporary safety. *Id.* at 745. While the defendant's belief may be considered, it is not dispositive. *Id.*

¶ 17 In *Lattimore v. State*, 720 So.2d 1000 (Ala.Crim.App.1998), the Alabama Court of Criminal Appeals held that whether a death occurred during immediate flight from a felony was a question of fact only rarely to be considered as a question of law by a court. *Id.* at 1003. Whether a defendant had reached a place of temporary safety was only one of many non-exclusive factors that may be appropriate in different factual settings. *Id.* "If anything, past history demonstrates the fruitlessness of attempting to apply rigid rules to virtually limitless factual variations. No single factor is necessarily controlling; it is the combination of several factors that leads to a justifiable inference." *Id.* at 1003–04. In *State v. Spencer*, 319 N.J.Super. 284, 725 A.2d 106 (App.Div.1999), the New Jersey appellate court · held that temporary safety was only one factor to be considered by the fact-finder when determining whether a death occurred during the commission of a

felony or during immediate flight from the felony. *Id.* at 118–19.

¶ 18 Cases which have concluded on their facts that a defendant reached a place of temporary safety and that this terminated the flight are distinguishable from the facts in the record before us. Examples include *State v. Williams*, 776 So.2d 1066, 1071 (Fla. Dist.Ct.App.2001), where defendants stopped for pizza, hung out at a convenience store, and later hung out at a sandwich shop after fleeing the scene of a car-jacking. In *People v. Balderas*, 41 Cal.3d 144, 222 Cal.Rptr. 184, 711 P.2d 480 (1985), the defendant was found to have reached a place of temporary safety when he was in unchallenged possession of stolen goods nearly nine hours after the robbery, and had engaged in a "leisurely journey" to recover another person's car. *Id.* at 495–96.[1]

¶ 19 We do not find these cases analogous or particularly persuasive. They merely address one non-exclusive factor in a limitless variety of possible factual considerations for determining whether a homicide occurred during immediate flight from a felony. The fact remains that the determination is to be made by the trier of fact, and it is not suited to prescribed formulas, time lines, or a convenient checklist of factors. Any and all evidence may be taken into account by the trier of fact in reaching a conclusion. We turn now to our review.

¶ 20 We do not weigh the evidence; that is the function of the fact-finder. *See State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989). "Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto–Fong*, 187 Ariz. 186, 200, 928 P.2d 610, 624 (1996) (citation omitted). "To set aside a [ ] verdict for insufficient evidence it must clearly appear that under no hypothesis whatever is there sufficient evidence to support the conclusion reached by the [fact-finder]." *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987) (citation omitted). Using this approach, we find that

---

**1.** *Balderas* was later abrogated on unrelated grounds. *See People v. Ricardi,* 9 Cal.App.4th 1427, 12 Cal.Rptr.2d 364, 367 (1992).

based on the record before us, there is sufficient evidence to support the convictions for both counts of felony murder.

¶ 21 The pursuit of Defendant and Campbell began when they were still in immediate flight from the robbery. It led from the jewelry store to the walled and gated apartment complex within minutes after the robbery. The pursuit lasted approximately seven minutes and covered a distance of less than three miles. Law enforcement officers lost sight of the Mustang for only a very short time before they regained contact and located the Mustang in the parking lot. The engine of the Mustang was left running, with the doors open, and parked at the end of seventy-five foot skid marks. Broken parts of a weapon were on the ground outside the car, and stolen jewelry was left in the car, on the ground near the car, and was strewn in a trail leading away from the car to the apartment where Defendant was hidden.

¶ 22 The complex was soon surrounded by law enforcement officers. Defendant and Campbell shattered a sliding glass door and attempted to at least partially conceal their entry by taking the damaged screen door into apartment 1086. They discarded and or concealed the stolen property and their weapons, and they attempted to change their appearance by shaving, discarding their own clothing, and wearing stolen clothing. Once the unit by unit search of the complex began, they would have been caught had they remained in apartment 1086. Considering everyone encountered in the complex was questioned, it is highly likely they would have been caught had they attempted any escape, as indeed they were when they tried to walk out.

¶ 23 Arguably, Defendant and Campbell never escaped because they were essentially under siege and were never out of jeopardy. They were, as aptly described by the State, "trapped like rats." Based on the record before us, we find sufficient evidence from which the fact-finder could conclude that at the time of the two homicides, Defendant was still in immediate flight from the robbery and could therefore be held culpable for the murders under the felony murder theory.

## CONCLUSION

¶ 24 For the above reasons, we reverse Defendant's conviction for the murder of Officer Snedigar based on the theory of premeditated murder. We affirm the convictions for both first-degree murders based on a felony-murder theory.

CONCURRING: PATRICK IRVINE and LAWRENCE F. WINTHROP, Judges.