859 P.2d 119

**STATE of Arizona, Appellee,**

v.

**William Diaz HERRERA, Sr., Appellant.**

**No. CR–89–0370–AP.**

Supreme Court of Arizona,
En Banc.

March 4, 1993.

Reconsideration Denied May 4, 1993.

Certiorari Denied Nov. 8, 1993.

See 114 S.Ct. 446.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Div., Phoenix, for the State.

John M. Antieau, Phoenix, for appellant.

## OPINION

CORCORAN, Justice.

In November 1989, a Maricopa County jury convicted William Diaz Herrera, Sr. (defendant) of kidnapping and first degree felony murder. Based on the circumstances of the crimes, the trial court sentenced defendant to consecutive sentences of death on the first degree felony murder conviction and 21 years' imprisonment on the kidnapping conviction.

The first degree felony murder conviction and death sentence are automatically appealed to this court. Defendant timely appealed his kidnapping conviction and prison sentence. *See* A.R.S. § 13–4033 and rules 26.15, 31.2(b) and 31.15(a)(3), Arizona Rules of Criminal Procedure.

We affirm defendant's convictions and sentences and have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035.

## ISSUES PRESENTED

Defendant raises the following issues on appeal:

1. Did the indictment charging defendant with kidnapping violate his right to due process?
2. Did the trial court's kidnapping instruction to the jury violate defendant's right to a unanimous verdict?
3. Was defendant improperly convicted of first degree felony murder when the underlying felony was the kidnapping of the murder victim?
4. Was the trial court's finding in aggravation that the murder was committed in an extremely heinous, cru-

**12**

el, or depraved manner improperly based on conduct by persons other than defendant?

5. Was the trial court's finding in aggravation that the murder was committed in an extremely heinous, cruel, or depraved manner based on a misapplication of the aggravation statute?

6. Was the trial court's finding that no mitigating circumstances were sufficiently substantial to call for leniency based on a misapplication of the mitigation statute?

## FACTS AND PROCEDURAL HISTORY

In the midafternoon of June 30, 1988, defendant, his sons William, Jr. (Junior), 19, Mickel, 18, and Ruben, 15, and Mickel's girlfriend, Mary Cardenas, went to a desert area in southwest Phoenix to drink beer and wine, talk, and listen to music. They had driven two vehicles, a yellow/tan Plymouth Duster and a dark blue four-wheel-drive Chevrolet pickup. The vehicles were nosed into some trees and shrubbery on the shoulder of a dirt road that ran east and west along the south bank of a fairly narrow irrigation canal. A similar dirt road ran along the canal's north bank.

At about 5:20 that afternoon, a motorist drove by the two vehicles. It looked to him that one vehicle had forced the other off the road. Shortly after driving by the vehicles, the motorist noticed a fully-marked sheriff's car coming his direction. He flagged down the sheriff's car and directed Deputy Sheriff Vernon Marconnet to the vehicles. Deputy Marconnet proceeded immediately to the scene.

At 5:23 p.m., Deputy Marconnet radioed in that he had encountered a blue Chevy pickup, license 616–NE, a yellow Plymouth Duster, license PNA–877, and approximately four males. After radioing in and parking his car behind the Duster and the pickup, Deputy Marconnet, a big, strong man dressed in full uniform, got out of his car and asked the men for identification.

Ruben complied and gave Deputy Marconnet his identification card. Defendant, however, refused to comply and cussed at Deputy Marconnet who then put him in the back seat of the sheriff's car.

After placing defendant in his car, Deputy Marconnet told Ruben to stand close to the back of the sheriff's car; he did so. Deputy Marconnet then went around to the passenger side of the pickup and asked Ms. Cardenas, who was sitting in the driver's seat, to provide the vehicle registration. She immediately stretched across the pickup's bench seat and began looking through the glove compartment for the registration.

Three witnesses testified as to what happened next. The first was defendant's son, Ruben Herrera. Ruben testified that after Deputy Marconnet asked Ms. Cardenas to get him the pickup's registration, he went around to the driver's side of the Duster and took the keys out of the ignition. He then went to the back of the Duster, opened the trunk, looked in, and, apparently finding nothing unusual, closed the trunk. Deputy Marconnet then looked in the bed of the pickup, again apparently finding nothing unusual.

Deputy Marconnet next began asking Junior and Mickel questions, and Junior started cussing at him. At that time, defendant yelled to Ruben, both in Spanish and in English, to open the door of the sheriff's car. Ruben made sure Deputy Marconnet was not looking, and then opened the back door on the passenger side of the sheriff's car and let defendant out. Defendant immediately "went towards the officer." Ruben stayed where he was and watched to "see if another officer was coming."

While Ruben was keeping watch, he heard something that sounded like "somebody hit somebody." He turned around and saw defendant and Junior "fighting with the officer." Ruben testified that he saw defendant strike the officer with his knee. After seeing this, Ruben turned around and "looked again to the road." He then turned back around, took a few steps closer, and saw Deputy Marconnet "already on the floor." At some point during

this scuffle, Deputy Marconnet called for a backup.

Although Ruben did not see anyone with Deputy Marconnet's gun, he heard a loud command, "Shoot him," and testified that it was defendant's voice. He also heard Junior say, "Shoot him" after that. Ruben testified that after a "kind of little long" while, he heard the sound of an explosion, like a gun going off. After that, everybody said, "Let's go."

Mickel and Ms. Cardenas fled in the pickup. Junior told Ruben to drive, so Ruben went to the driver's side of the Duster where he found the keys on the ground close to Deputy Marconnet's leg. He picked up the keys, jumped over Deputy Marconnet's body, backed the Duster into the sheriff's car, and then he, Junior and defendant fled.

While driving south toward Tucson, Ruben heard defendant say, "Lo maté" ("I killed him"). Later, the Duster had two blowouts, so Ruben, Junior and defendant began walking through the desert. After a while, defendant told his sons he could not go on. Ruben and Junior gave defendant a hug and a kiss on the cheek and kept walking toward Casa Grande.

Debra Shawver, who was driving east along the dirt road on the canal's north bank at approximately 5:30 that afternoon, also testified. Shawver, a registered nurse, was on her way home with her two children when she noticed the sheriff's car, the blue pickup and the Duster parked just across the canal. She initially thought an accident had occurred.

As a nurse, and expecting to see an accident, Shawver was quite observant. She testified that she could clearly see into the rear window of the sheriff's car, but that she saw no one in the back of the car. What she did see, however, was "[one] door open on the patrol car on the passenger side." She could not tell whether it was the front door or the back door, but she thought it was the front door. She noticed that the deputy was not in his car, "he was standing out by the pickup truck."

Shawver testified that Deputy Marconnet "was standing with his hands outstretched and he had something in his hand that was silvery." Shawver next saw "a couple of heads, and there was one by the patrol car also toward [Deputy Marconnet's] left, and then there was another gentleman that was standing facing him with his arms also outstretched with something black in his hand." She thought both things were guns. She also thought the men were Mexican or Indian.

Shawver later saw "[Deputy Marconnet's] arms [go] down in front of him down to his left side and [Deputy Marconnet] sort of stagger...." After observing these events, Shawver drove to a phone, called 911, and reported what she had seen. She then returned to the scene to offer help if necessary. There she met investigators, who were already investigating the murder.

Ms. Cardenas was still looking through the glove compartment for the pickup's registration when she heard the command "Freeze" spoken very loudly. She immediately sat up and saw Mickel holding Deputy Marconnet's gun with both hands straight in front of him, pointing the gun at the deputy. She also saw that Junior had grabbed the radio from Deputy Marconnet. Sometime later, Junior threw the radio at the deputy and struck him on the forehead.

From where Ms. Cardenas sat, her view was limited, but she later saw Deputy Marconnet lying on the ground and Mickel still holding the gun on him. Deputy Marconnet "had his hand over his face." Ms. Cardenas also saw Junior and the pink of the shirt Ruben was wearing. She did not see Ruben himself, nor did she see defendant.

As Ms. Cardenas watched, she was hoping that Mickel "would not do nothing." Ultimately, however, "Mickel shot the officer." She saw the gun discharge.

After the shot, Ms. Cardenas saw Mickel, Junior and Ruben. Mickel was running to the pickup and told Ms. Cardenas to turn it on. She also heard Junior tell Ruben to get defendant out of the car.

As Mickel and Ms. Cardenas were speeding away in the pickup, Mickel told her to look back. When she did so, she saw defendant and Ruben running toward the Duster.

After parting company with Junior and Ruben in the desert near Casa Grande, defendant hitch-hiked back to Phoenix. There he telephoned his friend Robert Martinez. He confided in Martinez as related by Martinez:

Defendant: We messed up.

Martinez: What do you mean by "We messed up?"

Defendant: Me and my boys messed up.

Martinez: What do you mean?

Defendant: You remember that cop that was shot yesterday?

Martinez: Yeah.

Defendant: We did it.

Martinez: What do you mean?

Defendant: Yeah, we did it. We were parked by the canal. Some cop goes over, gives us a hard time, pushes me around, et cetera, till I finally fell down. I was down. One of my boys did it. I think it was Mickel, but I am not sure.

After calling Martinez, defendant visited his sister, Anita Herrera. He told her that while he and his boys were drinking, "the cops stopped and handcuffed him and put him in the car." He also told her that Junior hit the cop and Mickel shot him.

When investigators arrived at the scene, they found Deputy Marconnet dead. He had been shot once through the right eye. Deputy Marconnet also had a gash in his left forehead. Dirt was imbedded in his trousers in the buttocks, crotch and leg areas. Deputy Marconnet's metal name plate was bent, and his shirt pockets were undone.

Additional physical evidence indicated that a scuffle preceded Deputy Marconnet's death. Investigators found a large number of footprints in the area where Deputy Marconnet's body was found. His sunglasses were found on the ground approximately 6 feet away from his feet, and his radio was found approximately 8 feet away from his head.

Investigators also found Ruben's identification card on the ground near Deputy Marconnet's body, as well as his fingerprint on the handle of the rear passenger door of the sheriff's car. The driver's door of the sheriff's car was open when investigators arrived at the scene. No other doors were open.

An autopsy revealed stippling on Deputy Marconnet's face and powder burns on his hands. According to expert testimony, this evidence indicates that his hands were raised above his face and that the gun was approximately 18 inches away from his face when it was fired.

Defendant was indicted with Junior and Mickel on one count of first degree murder, one count of aggravated robbery, and one count of kidnapping. The trial court severed Junior's and Mickel's trial from defendant's trial. Junior and Mickel went to trial together before defendant, were found guilty on all counts, and were sentenced to death and lengthy consecutive prison terms.

Ruben also faced murder, aggravated assault and kidnapping charges, but he entered into a plea agreement and pleaded guilty to kidnapping in return for his testimony in this case. Ruben was later sentenced to 10 years' imprisonment.

Defendant was tried alone on the three counts. At the close of the state's case, the trial court granted defendant's motion of acquittal on the aggravated robbery count, but denied his motion on the other counts. The jury found defendant guilty on both the first degree felony murder count and the kidnapping count. After the jury returned its verdict, the trial judge conducted one aggravation/mitigation hearing for defendant, Junior and Mickel. At the conclusion of the hearing, the trial judge sentenced defendant to death on the first degree felony murder conviction and a consecutive term of 21 years' imprisonment on the kidnapping conviction.

## DISCUSSION

### I. *The Kidnapping Conviction*

Defendant argues that the indictment charging him with kidnapping violated his right to due process, and that the trial court's kidnapping instructions to the jury violated his right to a unanimous verdict. We discuss these arguments in turn.

### A. *The Indictment*

■ Defendant argues for the first time on appeal that the indictment charging him with kidnapping violated his right to due process because it "gave [him] no idea what mental state, or on the part of whom, the state charged existed at the time of the homicide." Because defendant failed to raise this argument in the trial court, he has waived it on appeal absent a finding of fundamental error. *See State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). We find no error, fundamental or otherwise, in the grand jury's indictment.

■ The indictment charged defendant with

knowingly restrain[ing] VERNON MARCONNET with the intent to inflict death, physical injury, or a sexual offense on him, and/or otherwise aid[ing] in the commission of a felony, and/or with the intent to place VERNON MARCONNET in reasonable apprehension of imminent physical injury to VERNON MARCONNET, and/or knowingly restrain[ing] VERNON MARCONNET with the intent to interfere with the performance of a governmental or political function....

Although this indictment charged *alternative* mental states, it very clearly informed defendant of *each and every* mental state upon which the indictment was based and against which he had to defend. Thus, notwithstanding defendant's argument to the contrary, he *was* "informed of the nature and cause of the accusation." U.S. Const. amend. VI. *See also State v. Bruni*, 129 Ariz. 312, 317, 630 P.2d 1044, 1049 (App.1981) (indictment may properly charge alternative mental states).

■ Even if we had found fundamental error in the kidnapping indictment, we would conclude that it is harmless because defendant did, in fact, defend against each and every mental state charged. *See State v. Henley*, 141 Ariz. 465, 468–69, 687 P.2d 1220, 1223–24 (1984) (fundamental error not reversible error when substantial evidence in record supports verdict and error did not, beyond reasonable doubt, contribute significantly to verdict). Defendant's entire defense at trial was that he was in the sheriff's car while Junior and Mickel kidnapped, robbed and killed Deputy Marconnet, and that he did not participate in any of these offenses. This defense, of course, is sound as to each and every mental state charged in the indictment.

### B. *The Kidnapping Instructions*

■ Similar to his indictment argument, defendant argues for the first time on appeal that the trial court's kidnapping instruction "did not adequately instruct the jury about the decisions it must reach unanimously before finding [him] guilty of kidnapping...." Absent a finding of fundamental error, defendant has waived this argument on appeal because he failed to raise it in the trial court. *See Thomas*, 130 Ariz. at 435, 636 P.2d at 1217. We find no error, fundamental or otherwise, in the trial court's kidnapping instruction.

■ The trial court's kidnapping instruction to the jury read as follows:

The crime of kidnapping requires proof that the defendant knowingly restrained another person with the intent to:

1. Inflict death or physical injury on the person; or

2. Interfere with the performance of a governmental function; or

3. Place the victim in reasonable apprehension of imminent physical injury; or

4. Otherwise aid in the commission of a felony.

This instruction tracks virtually verbatim Arizona's kidnapping statute. A.R.S. § 13–1304(A)(3), (4) and (5). Pursuant to

this instruction, the jury found defendant "guilty of kidnapping."

The essence of defendant's argument is that he was denied his constitutional right to a unanimous jury verdict as guaranteed by Ariz. Const. art. 2, § 23, because, for example, some of the jurors could have found him guilty of kidnapping by finding that he restrained Deputy Marconnet with the intent to inflict physical injury on him, while the rest of the jurors could have found him guilty of kidnapping by finding that he restrained Deputy Marconnet with the intent to interfere with his governmental function. Thus, defendant would be convicted of kidnapping even though the jury could not unanimously agree on the manner in which he committed the kidnapping.

Although this scenario may have occurred, we are not persuaded that defendant was thereby denied any constitutional right. In Arizona, kidnapping is *one* crime, regardless of whether it occurs as a result of a knowing restraint with the intent to inflict physical injury *or* with the intent to interfere with the performance of a governmental function. As we stated in *State v. Encinas*, 132 Ariz. 493, 496–97, 647 P.2d 624, 627–28 (1982), "[a]lthough a defendant is entitled to a unanimous jury verdict on whether the criminal act charged has been committed, the defendant is not entitled to a unanimous verdict on the precise manner in which the act was committed." *See also, e.g., Griffin v. United States,* —— U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (Court affirmed conviction under jury instruction which permitted jury to convict if defendant found to have committed conspiracy in either of two manners); *Schad v. Arizona,* 501 U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (jury need not agree on manner in which defendant committed first degree murder); *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983) (same). We hold that defendant was properly convicted of kidnapping by a unanimous jury verdict.

## II. *The First Degree Felony Murder Conviction*

Defendant contends that his first degree felony murder conviction must be

reversed because "a conviction for felony murder cannot be premised on kidnapping." We reject this contention.

Citing *State v. Essman,* 98 Ariz. 228, 403 P.2d 540 (1965), defendant argues that just as assault merged into a subsequent homicide and could not be used as a predicate for felony murder at common law, where there is a single victim, kidnapping merges into a subsequent homicide and cannot be used as a predicate for felony murder. Whatever the merits of this argument, if any, we find no error in this case. The record establishes that the kidnapping and subsequent murder of Deputy Marconnet were not conceptually identical and did not occur as part of the same act. Rather, the kidnapping occurred when Deputy Marconnet was attacked and forced to lie on the ground. The murder occurred later, when defendant's order to shoot Deputy Marconnet was carried out. We hold that defendant's conviction for first degree felony murder was properly premised on kidnapping. *See State v. Herrera, Jr. I,* 176 Ariz. 21, 859 P.2d 131 (1993), filed today.

## III. *The Death Sentence*

Defendant maintains that his death sentence must be reversed because the trial court misapplied A.R.S. § 13–703(F) and (G). Specifically, defendant claims that the trial court improperly based its finding that the murder was committed in an extremely heinous, cruel, or depraved manner, § 13–703(F)(6), on Junior's and Mickel's conduct, not on his conduct, as well as on evidence not in the record in this case. Defendant also claims that the trial court improperly failed to find in mitigation that his participation in the murder was "relatively minor." *See* § 13–703(G)(3).

In capital cases, we must independently review the record to determine the absence or existence of both aggravating and mitigating circumstances and to determine, based on the record before us, whether the death penalty should be imposed. *See State v. Gillies,* 135 Ariz. 500, 511, 662

P.2d 1007, 1018 (1983). We now undertake this review.

### A. *Defendant's Conduct*

■ Defendant argues that the trial court's finding in aggravation "does not satisfy the level of individual conduct required by [A.R.S. § 13–703(F)(6)]." After reviewing the record before us, we conclude that it amply supports the trial court's finding that defendant's conduct satisfies the (F)(6) aggravating circumstance.

Section 13–703(F)(6) provides that the sentencing judge shall consider as an aggravating circumstance the fact that "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." In this case, defendant committed "the offense" of first degree felony murder. The question, then, is whether defendant committed Deputy Marconnet's murder in an especially heinous, cruel or depraved manner.

We find *Gillies* instructive in addressing this question. Gillies and an accomplice kidnapped, brutally raped, and ultimately murdered a helpless young woman. A jury later found Gillies guilty of first degree felony murder.[1] In finding the (F)(6) aggravating circumstance and sentencing Gillies to death, the trial judge found it immaterial who actually struck the fatal blow to the head of the victim. He relied instead on an abundance of evidence that "the victim suffered both physical pain and mental anguish" and the fact that Gillies was actively engaged in the kidnapping, the rape and the robbery of the victim and that he transported her to the place where she was killed. *Gillies*, 135 Ariz. at 513–14, 662 P.2d at 1020–21. The trial judge concluded, "Her death is the result that you wished to have occurred, that is manifestly clear by your statements and manner at the time the lady was killed. I do not find that your participation was relatively mi-

nor." *Gillies*, 135 Ariz. at 514, 662 P.2d at 1021. This court affirmed.

As in *Gillies*, the record before us provides an abundance of evidence showing that Deputy Marconnet suffered both physical pain and mental anguish before his death, and that defendant was actively engaged in causing that pain and anguish. After being physically overpowered by defendant and his sons, Deputy Marconnet was forced to lie supine on the ground. He was unarmed, and he had a gash in his forehead. He knew he was helpless.

As he lay helpless on the ground, he looked up into the barrel of his own gun, knowing that the gun could be fired either by pulling the hammer back and then squeezing the trigger, or by merely squeezing the trigger. He shielded himself the only way he could; he put "his hand over his face." As Deputy Marconnet lay there, he undoubtedly hoped that he would not be shot. His hopes were crushed, however, when he heard *defendant* command his son to "Shoot him." Then, after a "kind of little long" while, the command was heeded and Deputy Marconnet's worst fear was his last.

These facts establish cruelty under the (F)(6) aggravating circumstance. *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983) ("Cruelty has been specifically defined to involve the infliction of pain on the victim[ ].... [O]ur concept of cruelty involves not only physical pain, but also 'mental * * * distress visited upon the victim[ ].'") (citation omitted); *State v. Correll*, 148 Ariz. 468, 480, 715 P.2d 721, 733 (1986) ("Cruelty can involve mental as well as physical suffering. A victim's uncertainty as to the ultimate fate can be significant in indicating mental suffering.").

As in *Gillies*, Deputy Marconnet's "death is the result that [defendant] wished to have occurred, that is manifestly clear by [his] statements and manner at the time

---

1. This statement is practically, although not technically, correct. The *Gillies* jury was instructed on both first degree premeditated murder and first degree felony murder. The jury did not specify which type of first degree murder Gillies committed, but instead simply returned a general verdict of guilty of first degree murder. For purposes of our discussion of Gillies' death sentence, however, we assumed that the jury found him guilty of first degree felony murder. *See Gillies*, 135 Ariz. at 513, 662 P.2d at 1020.

[Deputy Marconnet] was killed." Defendant's participation in Deputy Marconnet's murder was substantial and intentional. Because the finding by the trial court beyond a reasonable doubt that the murder was especially cruel is so compelling, and because the trial court made no finding as to heinousness or depravity, it is unnecessary for us to make findings of heinousness or depravity. *See, e.g., Gillies,* 135 Ariz. at 513, 662 P.2d at 1020; *State v. Clark,* 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980) ("[I]t [is] not necessary that all three elements, heinous, cruel, [and] depraved, be present in the murder. The statutory expression is in the disjunctive, so either all or one could constitute an aggravating circumstance.").

We do *not* consider A.R.S. § 13-703(F)(10) (murder of peace officer) as an aggravating circumstance because its effective date was *after* Deputy Marconnet's murder. Laws 1988, Ch. 155, § 1.

### B. *The Record in This Case*

■ The final objection to the trial court's finding of cruelty is that the trial court relied upon inadmissible evidence to find cruelty in violation of our statutes and defendant's rights under the confrontation and due process clauses. In essence, defendant claims that the trial judge impermissibly relied on evidence introduced at Junior's and Mickel's trial in finding the (F)(6) aggravating circumstance in this case. We agree with defendant that a trial judge may consider evidence introduced only at the trial or at the aggravation/mitigation hearing of *the defendant being sentenced. See* § 13-703(C) ("[T]he admissibility of information relevant to any of the aggravating circumstances set forth in subsection F of this section shall be governed by the rules governing the admission of evidence at criminal trials. Evidence admitted at the trial, relating to such aggravating or mitigating circumstances, shall be considered without reintroducing it at

the sentencing proceeding."). However, even though the record indicates that the trial judge in this case made findings not precisely supported by the record in this case, we conclude that none of the trial court's unsupported findings, either individually or cumulatively, constitute reversible error.

■ Specifically, defendant challenges the following (numbered) findings made by the trial judge in his special verdict: [2]

1. The evidence showed that this defendant, in conjunction with defendants Mickel Herrera and William Herrera, Junior, participated in physically abusing the victim by pushing, shoving and striking him.

This finding is amply supported by the record. While the record does not establish that defendant *alone* pushed, shoved and struck Deputy Marconnet, it does establish that defendant, *in conjunction with* Mickel and Junior, pushed, shoved and struck Deputy Marconnet.

2. In addition, this defendant kneed the victim in the groin.

This finding is not precisely supported by the record. Ruben testified that defendant struck Deputy Marconnet with his knee. Neither he nor anyone else, however, testified that defendant kneed Deputy Marconnet in the groin.

While no one testified that defendant kneed Deputy Marconnet in the groin, Exhibit 6 clearly shows dirt imbedded in the crotch area of Deputy Marconnet's trousers. Additionally, Detective Moore of the Maricopa County Sheriff's Department testified that, based on his training and experience, the dirt embedded in the crotch area indicated that the area "was struck with a dirty object while [Deputy Marconnet] was laying down in the position that he was

---

**2.** Defendant lists 11 "findings" as not supported by the record. As to 3 of these findings, however, his only argument is that they do not show that defendant committed Deputy Marconnet's murder in an especially heinous, cruel or depraved manner. Because we have found that defendant committed the murder in an especially cruel manner, we do not address those 3 non-disputed findings.

found," and that it was "consistent with a kick in the groin."

The trial judge obviously conflated these two sources of evidence in finding that defendant kneed the victim in the groin. We agree with defendant, however, that it would be virtually impossible to knee in the groin someone who is lying down. Nevertheless, *where* defendant kneed Deputy Marconnet is immaterial. What is material is the fact that defendant *did* knee Deputy Marconnet and thereby actively participated in causing Deputy Marconnet to suffer physical pain.

3. During this time, as he was lying helplessly on his back, his portable radio, which had been taken by defendant William Herrera, Junior, was thrown with great force directly into his face and struck his left forehead, causing a deep gash.

Defendant challenges the trial court's use of the word "gash." He relies on the testimony of George Bolduc, M.D., who testified that "gash" would suggest something deeper than the wound on Deputy Marconnet's forehead. Although Deputy Marconnet's forehead wound may not be considered a "gash" in medical terminology, after examining Exhibit 41, a photograph of the wound, we believe that the trial judge's reference to the wound as a "gash" is amply supported by the record.

4. Thereafter, this defendant, in conjunction with his son, William Herrera, Junior, actively encouraged and directed his other son, Mickel Herrera, to fire the gun at the deputy by shouting on a number of occasions, "Shoot him." "Shoot him." in addition to shouting various obscenities.

With the exception of the phrase "in addition to shouting various obscenities," this finding is amply supported by the record. Although no evidence in the record substantiates that defendant shouted obscenities, we consider the trial judge's reference to such obscenities cumulative and immaterial.

5. During this time, the victim partially raised his upper body from the ground and extended his arms in front of him, in effect begging for mercy and pleading with the defendants not to kill him.

Defendant maintains that there is no basis in the record for the trial court's finding that "the victim partially raised his upper body from the ground." While it may be true that no one testified that Deputy Marconnet partially raised his upper body from the ground, we conclude that the record amply supports such a finding. Mary Cardenas testified that as he lay on the ground, Deputy Marconnet had his hand over his face. Dr. Bolduc testified that Deputy Marconnet had powder burns on both of his hands, which indicated that they were in front of his face when he was shot. Dr. Bolduc also testified that, based on stippling on Deputy Marconnet's face, the gun was approximately 18 inches away from his face when he was shot. This evidence, considered as a whole, certainly permits a reasonable inference that Deputy Marconnet raised himself up, placed his hands in front of his face, and sought mercy before being shot.

6. Deputy Marconnet remained on his back in the dirt in this position with the gun pointed at him and with the screams of his tormentors ringing in his ears. This went on for a period of time estimated by those present to be from 18 seconds to two or three minutes.

With the exception of the trial court's reference to "18 seconds to two or three minutes," this finding is amply supported by the record. As to the reference to "18 seconds to two or three minutes," we consider this materially correct. Ruben testified that after Deputy Marconnet was on the "floor," he heard his father, then Junior, say "Shoot him." After he heard these commands, it was a "kind of little long" while until he heard the sound of an explosion, like a gun going off.

Ms. Cardenas also testified that when she heard the command "Freeze," she looked up and saw Mickel with Deputy Marconnet's gun. It was *after* Mickel had his gun that Deputy Marconnet was forced to lie helplessly on the ground, listen to his

tormentors' screams, and ultimately suffer death at the hands of the Herreras.

 While the record does not support the trial court's reference to "18 seconds to two or three minutes," it clearly demonstrates that *enough* time elapsed between the time that Deputy Marconnet's gun was taken away from him and the time that he was shot to give rise to tremendous emotional anguish.

7. During this time, the victim must have experienced extreme and terrifying fear while staring into the barrel of the gun pointed at his face, before defendant Mickel Herrera fired the fatal shot into the deputy's forehead just above his right eye.

Defendant takes exception with the trial court's use of the phrase "extreme and terrifying fear." Based on the record before us, we believe that the trial court's choice of words is appropriate.

8. In his final moments of life, the victim, in addition to enduring physical pain and suffering, obviously underwent excruciating mental anguish as well.

Defendant objects to the trial court's use of the phrase "excruciating mental anguish." Based on the record before us, and as with the trial court's finding of "extreme and terrifying fear," we believe that the trial court's choice of words is appropriate.

We have reviewed each finding the trial court made in its special verdict. Although we have found some that are not precisely supported by the exact language of the record, we find no error with those findings, either individually or cumulatively. On the other hand, we have found ample evidence establishing, and therefore affirm the trial court's finding, that defendant committed Deputy Marconnet's murder in an especially cruel manner. *See* A.R.S. § 13–703(F)(6); *State v. Clark*, 126 Ariz. 428, 616 P.2d 888 (1980).

## C. *Defendant's Participation*

 As discussed above in Part III(A), we find that defendant's participation in the kidnapping and murder of Deputy Marconnet was substantial. We therefore re-

ject defendant's argument that the § 13–703(G)(3) mitigating circumstance—that defendant's participation was relatively minor—was present in this case.

## D. *Enmund Findings*

 Although not directly raised by defendant, we have determined that the requirements of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), have been satisfied. In his special verdict, the trial judge expressly made an *Enmund* finding:

From the evidence introduced at trial, the evidence introduced at the sentencing hearing, and the entire file in this case, the court finds that this defendant, William Herrera, Senior, actively participated along with the defendants Mickel Herrera and William Herrera, Junior, and that the evidence supports beyond a reasonable doubt that he intended that his son, Mickel Herrera, kill the victim Vernon Marconnet by shooting him to death.

*See Enmund*, 458 U.S. at 801, 102 S.Ct. at 3378–79 (one convicted of felony murder but who did not actually kill the victim may be sentenced to death if he "intended that a killing take place"). This finding satisfies *Enmund*.

## E. *Proportionality Review*

 Defendant argues that a proportionality review is required in all death penalty cases. Such a review is no longer necessary. *State v. Salazar*, 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992).

## DISPOSITION

We have examined the record for fundamental error pursuant to A.R.S. § 13–4035 and have found none. We therefore affirm defendant's first degree felony murder conviction and death sentence and his consecutive kidnapping conviction and prison sentence.

FELDMAN, C.J., MOELLER, V.C.J., and JAMES DUKE CAMERON (Retired) and FRANK X. GORDON, Jr., JJ. (Retired), concur.

NOTE: Justices THOMAS A. ZLAKET and FREDERICK J. MARTONE did not participate in the determination of this matter.