898 P.2d 454
182 Ariz. 505

**STATE of Arizona, Appellee,**

v.

**Richard Dale STOKLEY, Appellant.**

**No. CR–92–0278–AP.**

Supreme Court of Arizona,
En Banc.

June 27, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section, Phoenix, Eric J. Olsson, Tucson, for appellee.

Ivan S. Abrams, Douglas, for appellant.

## OPINION

MOELLER, Vice Chief Justice.

### JURISDICTION

This is a capital case in which we review Richard Stokley's convictions for two counts of first degree murder, two counts of kidnapping, and one count of sexual conduct with a minor under the age of fifteen. We also review the two death sentences imposed on the murder counts. Appeal to this court is automatic. Ariz.R.Crim.P. 31.2(b). We have jurisdiction pursuant to Ariz.Rev.Stat.Ann. (A.R.S.) §§ 13–4031 (1989) and 13–4033 (1989 and Supp.1994). We affirm the convictions and sentences.

### FACTS AND PROCEDURAL HISTORY

On the Fourth of July weekend, 1991, two thirteen year old girls, Mary and Mandy,[1] attended a community celebration near Elfrida, Arizona. The thirty-eight year old defendant also attended the festival to work as a stuntman in Old West reenactments.

Mary and Mandy, along with numerous other local children, camped out at the celebration site on July 7. That night co-defendant Randy Brazeal, age twenty, showed up at the campsite. Brazeal had previously dated Mandy's older sister and knew Mandy. During the evening, Brazeal approached the girls' tent and had a discussion with Mary and Mandy. The girls were also seen standing next to Brazeal's car speaking to Brazeal, who was in the driver's seat, while defendant was in the passenger seat. Around 1:00 a.m. on July 8, 1991, the girls told a friend they were going to the restroom. They never returned.

The next day Brazeal surrendered himself and his car to police in Chandler, Arizona. The hood of the car had semen stains, as well as dents matching the shape of human buttocks. Palm prints on the hood matched Brazeal. The back seat had semen stains matching defendant and also had blood stains. Police found a bloody pair of men's pants in the car.

Meanwhile, defendant called a woman in Elfrida asking her to send someone to pick him up in Benson, Arizona. The woman asked about the missing girls, to which defendant replied, "What girls? I don't know anything about any girls." Police arrested defendant that same day at a Benson truck stop. Police found blood stains on his shoes, and his pants looked as if they had recently been cut off at the knee.

After reading defendant his *Miranda* rights, police questioned defendant at the Benson police station. At first he denied any knowledge of the girls, but after hearing about Brazeal's arrest and being asked about "a particular mine shaft around Gleason," he admitted that he and Brazeal had sexually assaulted the girls. He admitted having sex with "the brown haired girl" (Mandy) and stated that Brazeal had sex with both of them. He also said he and Brazeal had discussed killing the girls, after which defendant choked one and Brazeal strangled the other. He admitted, "I ... choked 'em.... There was one foot moving though I knew they was brain dead but I was getting scared.... They just wouldn't quit. It was terrible." Defendant also admitted using his knife on both girls. After killing the girls, they dumped the bodies down a mine shaft.

Defendant led the police to the abandoned mine shaft and expressed hope that the trial would not take long so he could "get the needle and get it over with." After explaining how they had moved timbers covering the shaft to dump the bodies, he pointed out where he and Brazeal had burned the girls' clothes.

Police recovered the nude bodies from the muddy mine shaft. Autopsies showed that both girls had been sexually assaulted, strangled (the cause of death), and stabbed in the right eye. The strangulation marks showed repeated efforts to kill, as the grip was relaxed and then tightened again. Both victims suffered internal and external injuries to their necks. Mandy also had stomp marks on her body that matched the soles of defen-

1. We do not use the victims' last names in this published opinion.

dant's shoes. Evidence was consistent with each victim being killed by a different perpetrator. In particular, Mary's body had a mark on the neck consistent with Brazeal's boot, whereas bruise marks on Mandy matched the soles of defendant's shoes. And more force was used in strangling Mandy than Mary. DNA analysis indicated that both defendants had intercourse with Mandy. Mary's body cavities were filled with mud, making DNA analysis impossible.

The jury found defendant guilty of two counts of kidnapping, one count of sexual conduct with a minor under the age of fifteen (Mandy), and two counts of premeditated first degree murder. It acquitted him on two counts of sexual assault (Mary and Mandy) and one count of sexual conduct with a minor under the age of fifteen (Mary). Defendant and the state stipulated to sentences on the noncapital offenses. The trial court accepted the stipulation and sentenced accordingly.

Following a sentencing hearing on the capital counts, the trial court rendered a detailed, twelve-page special verdict. The trial court found that the facts established beyond a reasonable doubt that (1) both adults engaged in sex with the girls, (2) the defendants agreed to kill both girls, (3) defendant intentionally killed Mandy, (4) Brazeal intentionally killed Mary, (5) both Mary and Mandy suffered great physical pain and mental anguish during strangulation, (6) defendant admitted choking both victims, (7) both bodies were stomped, with that of Mandy bearing the imprint of defendant's sneaker, (8) defendant stabbed both girls, Mandy through the right eye and Mary in the vicinity of the right eye, and (9) although alcohol was involved, defendant had sufficient recall and understanding of the events the next day.

The trial court found three statutory aggravating circumstances for both murders: (1) victim under age fifteen (A.R.S. § 13–703(F)(9) (amended 1993)); (2) multiple homicides (A.R.S. § 13–703(F)(8) (1989)); and (3) especially heinous, cruel or depraved (A.R.S. § 13–703(F)(6) (1989)). The court rejected all the claimed mitigating circumstances offered by defendant, including law abiding past, cooperation with police, alcohol use, prior head injuries, and co-defendant Brazeal's twenty-year sentence. The trial court also expressly stated that it was unable to find any other mitigating circumstances not expressly offered by defense counsel. The court sentenced defendant to death for both murders.

## TRIAL ISSUES

### I. Change of Venue

Several months before trial, defendant made a motion for change of venue because of pretrial publicity, which the trial court denied, expressly granting leave to renew the motion. Defendant did not renew the motion. Appellate counsel urges us to hold that failure to change venue constituted fundamental error.

■ A trial court's ruling on a motion for change of venue based on pretrial publicity is a discretionary decision and will not be overturned absent an abuse of discretion and prejudice to the defendant. *State v. Salazar*, 173 Ariz. 399, 406, 844 P.2d 566, 573 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993). There is a two-step inquiry for pretrial publicity: (1) did the publicity pervade the court proceedings to the extent that prejudice can be presumed?; if not, then (2) did defendant show actual prejudice among members of the jury? The defendant has the burden of showing prejudice. *State v. Bible*, 175 Ariz. 549, 564, 566, 858 P.2d 1152, 1167, 1169 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); Ariz.R.Crim.P. 10.3(b). Because defendant made no effort to show actual prejudice of the jury at the time of trial and because our examination of the voir dire fails to show such prejudice, we consider whether the pretrial motion demonstrated a situation in which prejudice should be presumed.

■ For a court to presume prejudice, defendant must show "pretrial publicity so outrageous that it promises to turn the trial into a mockery of justice or a mere formality." *Bible*, 175 Ariz. at 563, 858 P.2d at 1166. To reach a conclusion on presumed prejudice, we review the entire record, without regard

to the answers given in voir dire. *Id.* at 565, 858 P.2d at 1168.

■ Defendant cites the widespread media coverage of the incident and the trial, the age and popularity of the victims, and the impact the murders had in southern Arizona, including petition drives and fundraisers for the victims' families, as precluding the possibility of obtaining a fair and impartial jury. He submitted to the trial court a copy of a flyer for a fundraiser for the victims' funeral expenses, numerous newspaper articles, and petitions signed by hundreds of area residents requesting that a plea agreement not be given. The newspaper articles generally discussed facts of the incident, arrest, pretrial proceedings, and the plea agreement of co-defendant Brazeal. Defendant fails to show how these articles, the petitions, and the flyer resulted in a trial that was "utterly corrupted." *Id.* (quoting *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975)).

■ It would be strange to presume prejudice in a case in which the record negates actual prejudice. The relevant inquiry for actual prejudice is the effect of the publicity on the objectivity of the jurors, not the fact of the publicity itself. *Bible,* 175 Ariz. at 566, 858 P.2d at 1169. Defendant did not show that the jurors had "formed preconceived notions concerning the defendant's guilt and that they [could not] lay those notions aside." *State v. Chaney,* 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984).

Although almost all of the prospective jurors had heard about the case, the voir dire by both the judge and defense counsel thoroughly probed the issue of publicity. There was extensive voir dire, both collectively and individually. The judge also asked specifically if any of the panel members had signed the "no plea bargain" petition. Anyone who had was subject to further voir dire. Only those prospective jurors that indicated that they could set aside the publicity and decide the case on the evidence presented remained on the jury panel. Jurors who could not be fair or impartial were dismissed. *See State v. Atwood,* 171 Ariz. 576, 632, 832 P.2d 593, 649 (1992), *cert. denied,* — U.S. —, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). The

empaneled jury was repeatedly warned to avoid media coverage of the trial. There is no basis on which to presume prejudice.

## II. Death Qualifying Potential Jurors

During voir dire the panelists were asked whether they had conscientious or religious objections to the death penalty that would prevent them from voting for a first degree murder conviction. Only one panelist raised her hand; she faced further inquiry by the court and stated that it would not influence her decision on whether defendant was guilty. No prospective jurors were excused because of their views on capital punishment.

■ Defendant argues that death-qualified juries are pro-prosecution and therefore biased and that a death-qualified jury is not drawn from a fair cross-section of the community. Because defense counsel made no objection on this basis, the issue would normally be waived. *State v. Herrera,* 176 Ariz. 9, 15, 859 P.2d 119, 125, *cert. denied,* — U.S. —, 114 S.Ct. 446, 126 L.Ed.2d 379 (1993). However, defendant appears to be arguing that death qualification of a jury is fundamental error.

There is no error, fundamental or otherwise. Defendant acknowledges that accepting his argument would require changing both state and federal case law. *See Wainwright v. Witt,* 469 U.S. 412, 424 n. 5, 105 S.Ct. 844, 852 n. 5, 83 L.Ed.2d 841 (1985); *Salazar,* 173 Ariz. at 411, 844 P.2d at 578.

## III. Photographs of the Victims

The trial court admitted into evidence five autopsy photographs of the victims. Defendant made no objections at trial. Defendant argues on appeal that admission of these exhibits was fundamental error.

■ Absent fundamental error, the admission of the exhibits cannot be raised on appeal if no objections were made at trial. *State v. Harding,* 137 Ariz. 278, 291, 670 P.2d 383, 396 (1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984); *see State v. Wilcynski,* 111 Ariz. 533, 535, 534 P.2d 738, 740, *cert. denied,* 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975). We will

find fundamental error only "when it goes to the foundation of the case, takes from a defendant a right essential to the defense, or is of such magnitude that it cannot be said it is possible for the defendant to have had a fair trial." *State v. Cornell,* 179 Ariz. 314, 329, 878 P.2d 1352, 1367 (1994).

■ Exhibit 36 is a photograph of the right side of Mandy's face, showing a laceration below the right eye and what appear to be stomp marks below the cheek. Exhibit 37 shows a tennis shoe stomp mark on Mandy's torso. Exhibit 38 shows a stomp mark on her left shoulder, along with a portion of her chin and cheek. Exhibit 39 shows bruise marks below the neck and around the chin of Mandy. Exhibit 40 includes the lower face, neck, and shoulder area of Mary and shows bruises and abrasions around the neck and chin area.

■ The admission of photographs requires a three-part inquiry: (1) relevance; (2) tendency to incite passion or inflame the jury; and (3) probative value versus potential to cause unfair prejudice. *State v. Amaya–Ruiz,* 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991); *see* Ariz. R.Evid. 401–03. The photographs are relevant if they aid the jury in understanding an issue. Ariz.R.Evid. 401; *State v. Moorman,* 154 Ariz. 578, 586, 744 P.2d 679, 687 (1987). These photographs show the manner of killing and the identity of the killer, particularly those photos showing stomp marks that match the shoes worn by defendant. They were introduced during the testimony of the forensic pathologist who conducted the autopsies. Although these exhibits show discoloration of the skin, abrasions, stomp and bruise marks, and cuts to the victims' right eyes, they are not gruesome enough to be inflammatory. "Such photographs cannot be deemed sufficiently gruesome to inflame the jurors because 'the crime committed was so atrocious that photographs could add little to the repugnance felt by anyone who heard the testimony.'" *State v. Lopez,* 174 Ariz. 131, 139, 847 P.2d 1078, 1086 (1992) (citation omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). Even if inflammatory, the probative value of the photos outweighs any prejudicial effect. *See* Ariz. R.Evid. 403; *State v. Chapple,* 135 Ariz. 281, 288–90, 660 P.2d 1208, 1215–17 (1983); *State v. Steele,* 120 Ariz. 462, 464, 586 P.2d 1274, 1276 (1978).

The trial court did not abuse its discretion in admitting the photographs, *Lopez,* 174 Ariz. at 139, 847 P.2d at 1086, and certainly did not commit fundamental error.

## IV. Verdict

■ Defendant contends that the jury was instructed on both premeditated murder and felony murder and, therefore, the verdicts of the murder counts may not have been unanimous. Defendant's argument is fundamentally flawed. Contrary to his assertion, the jury was not instructed on felony murder. The jury unanimously found defendant guilty of two premeditated murders.

But even if defendant's factual predicate were correct, no error would be presented. *Schad v. Arizona,* 501 U.S. 624, 645, 111 S.Ct. 2491, 2504, 115 L.Ed.2d 555 (1991); *State v. Lopez,* 163 Ariz. 108, 111, 786 P.2d 959, 962 (1990); *State v. Libberton,* 141 Ariz. 132, 136, 685 P.2d 1284, 1288 (1984). "First degree murder is only one crime regardless of whether it occurs as premeditated or felony murder and the defendant is not entitled to a verdict on the precise manner in which the act was committed." *State v. Gillies,* 135 Ariz. 500, 510, 662 P.2d 1007, 1017 (1983).

## SENTENCING ISSUES

### I. Constitutionality of Arizona's Death Penalty Statute

Defendant makes several arguments that we have recently rejected and now deal with summarily.

■ A. There is no constitutional right to have a jury determine aggravating or mitigating circumstances. *Walton v. Arizona,* 497 U.S. 639, 647–49, 110 S.Ct. 3047, 3054–55, 111 L.Ed.2d 511 (1990); *State v. Apelt,* 176 Ariz. 369, 373, 861 P.2d 654, 658 (1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 113, 130 L.Ed.2d 59 (1994).

■ B. Requiring defendants to prove any mitigating circumstances by a preponderance of the evidence is constitutional. *Walton,* 497 U.S. at 649–51, 110 S.Ct. at 3055–56.

■ C. Although the state must prove aggravating circumstances beyond a reasonable doubt, *State v. Herrera,* 174 Ariz. 387, 397, 850 P.2d 100, 110 (1993), the court is not required to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. *State v. Walton,* 159 Ariz. 571, 584, 769 P.2d 1017, 1030 (1989), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *cf. Franklin v. Lynaugh,* 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988) ("[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.").

■ D. Defendant contends that there is a lack of objective standards for determining whether aggravating circumstances outweigh mitigating circumstances. This argument has been rejected. *Salazar,* 173 Ariz. at 411, 844 P.2d at 578; *State v. Correll,* 148 Ariz. 468, 484, 715 P.2d 721, 737 (1986).

■ E. Defendant argues that poor, male defendants are discriminated against in the application of the death penalty. A defendant alleging discrimination must prove "the decisionmaker[ ] in *his* case acted with discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987). Defendant offers no evidence that his economic status or gender contributed to his sentence or biased the sentencing process. *See Jeffers v. Lewis,* 38 F.3d 411, 419 (9th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1995); *see also State v. White,* 168 Ariz. 500, 513, 815 P.2d 869, 882 (1991) (death penalty statute is gender neutral), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992). Absent evidence of purposeful discrimination, this argument has been rejected. *Apelt,* 176 Ariz. at 373, 861 P.2d at 658.

■ F. The death penalty is not cruel and unusual if it is not imposed in an arbitrary and capricious manner. *Gregg v. Georgia,* 428 U.S. 153, 195, 96 S.Ct. 2909, 2935–36, 49 L.Ed.2d 859 (1976); *State v. Blazak,* 131 Ariz. 598, 601, 643 P.2d 694, 697, *cert. denied,* 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). Although defendant argues that the death penalty is imposed arbitrarily and irrationally in Arizona, that argument has been rejected by this court. *Salazar,* 173 Ariz. at 411, 844 P.2d at 578. The death penalty statute narrowly defines death-eligible persons as those convicted of first degree murder, where the state has proven one or more statutory aggravating factors beyond a reasonable doubt. *State v. Greenway,* 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

■ G. This court does not conduct proportionality reviews. *Salazar,* 173 Ariz. at 416, 844 P.2d at 583.

■ H. The especially heinous, cruel, or depraved aggravating circumstance (A.R.S. § 13–703(F)(6)) is constitutional. *Walton,* 497 U.S. at 655, 110 S.Ct. at 3058.

## II. Independent Review

■ When a death sentence is imposed in Arizona, this court independently reviews the entire record for error, determines whether the aggravating circumstances have been proved beyond a reasonable doubt, considers any mitigating circumstances, and then weighs the aggravating and mitigating circumstances in deciding whether there are mitigating circumstances sufficiently substantial to call for leniency. *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797, *cert. denied,* — U.S. —, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).

## III. Aggravating Factors

■ To make a defendant death eligible, the state must prove beyond a reasonable doubt at least one statutory aggravating circumstance. A.R.S. § 13–703(E) (1989) (amended 1993); *Brewer,* 170 Ariz. at 500, 826 P.2d at 797. In this case, the trial court found that the state proved three aggravating circumstances:

A. Defendant was an adult at the time the crimes were committed and the victims were under the age of fifteen. A.R.S. § 13–703(F)(9) (1989) (amended 1993).

B. Defendant has been convicted of one or more other homicides which were committed during the commission of the offense. A.R.S. § 13–703(F)(8) (1989).

C. Defendant committed the offense in an especially heinous, cruel, or depraved manner.

A.R.S. § 13–703(F)(6) (1989).

The first two aggravators are not challenged on appeal. Our review of the record confirms that they were proved beyond a reasonable doubt. *See State v. Kiles,* 175 Ariz. 358, 369 n. 5, 857 P.2d 1212, 1223 n. 5 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994); *see Greenway,* 170 Ariz. at 167–68, 823 P.2d at 34–35 (explaining that the (F)(8) aggravating factor applies to multiple murders); *State v. Gallegos,* 178 Ariz. 1, 15, 870 P.2d 1097, 1111, *cert. denied,* —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994) (finding (F)(9) aggravating circumstance). We turn, then, to the third aggravating circumstance, which is challenged on appeal.

### A. Especially Heinous, Cruel, or Depraved

#### 1. Especially Cruel

 The heinous, cruel, or depraved circumstance is phrased in the disjunctive, so if any one of the three factors is found, the circumstance is satisfied. *Brewer,* 170 Ariz. at 501, 826 P.2d at 798. Cruelty focuses on the victim and is found where there has been an infliction of pain and suffering in a wanton, insensitive, or vindictive manner. *Correll,* 148 Ariz. at 480, 715 P.2d at 733. A crime is especially cruel when the defendant "inflicts mental anguish or physical abuse before the victim's death." *Walton,* 159 Ariz. at 586, 769 P.2d at 1032. Mental anguish results "especially if a victim experiences significant uncertainty as to the ultimate fate." *Brewer,* 170 Ariz. at 501, 826 P.2d at 798.

 The trial court found cruelty, noting:

The victims were alive for some minutes from the start of the fatal assaults. They experienced great physical pain and mental anguish as they fought to free themselves. There [was] frequent repositioning of the hands of the killers on the throats of the victims, and the reasserting of the pressure until they were unconscious. Medical evidence cannot establish the moment of cessation of consciousness, when, supposedly, physical pain ceases, but did show that death was not instantaneous.

It was a cruel death for both victims, considering the extent of physical injuries to the bodies, much of which must have been experienced while conscious.

The defendant entered into an agreement with Brazeal to kill both girls.... The defendant, just as surely as he did with Mandy ..., intended the killing of Mary.... The elements of these aggravating circumstances apply to the defendant as to both murders.

The forensic pathologist who conducted the autopsies testified that the cause of death for both girls was asphyxia due to manual strangulation. The pathologist testified that a victim of strangulation is generally conscious for a few minutes and that death usually takes twelve to fifteen minutes. There was evidence of repetitive gripping of Mary's neck. The abrasions on Mandy's neck were consistent with fingernail scratches. Both suffered injuries, including bruises, abrasions, and stab wounds near or in the right eye that occurred while still alive or shortly after death. Both victims also suffered hemorrhaging in the vaginal area, consistent with sexual activity before death. The stomp marks on Mandy's body, face, and neck were caused while the victim was alive or shortly after death. Mandy also suffered a complete fracture of the cranium and laceration of the skull. Both victims had injuries indicative of a struggle. The evidence showed that at least some of the injuries occurred while the victims were conscious, sufficient for a finding of cruelty under A.R.S. § 13–703(F)(6). *See Kiles,* 175 Ariz. at 371, 857 P.2d at 1225. "It is clear that [defendant] knew or should have known that his actions would cause suffering." *State v. Runningeagle,* 176 Ariz.

59, 65, 859 P.2d 169, 175, *cert. denied,* —— U.S. ——, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993).

### 2. Especially Heinous or Depraved

■■■■ Heinousness and depravity "focus on the defendant's mental state and attitude as reflected by his words or actions." *Brewer,* 170 Ariz. at 502, 826 P.2d at 799. We look for the following circumstances in determining whether a crime is especially heinous or depraved: (1) apparent relishing of the murder; (2) infliction of gratuitous violence on the victim beyond the murderous act itself; (3) mutilation of the victim's body; (4) senselessness of the crime; and (5) helplessness of the victim. *State v. Gretzler,* 135 Ariz. 42, 51–52, 659 P.2d 1, 10–11, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *see also State v. Barreras,* 181 Ariz. 516, 522, 892 P.2d 852, 858 (1995). The last two factors are usually less probative of defendant's state of mind than the first three factors. *Barreras,* 181 Ariz. at 522, 892 P.2d at 858; *State v. King,* 180 Ariz. 268, 287, 883 P.2d 1024, 1043 (1994) ("[O]nly under limited circumstances will the senselessness of a murder or helplessness of the victim ... lead to [finding heinousness or depravity]."). Witness elimination is also given some weight in finding the circumstance. *State v. Ross,* 180 Ariz. 598, 606, 886 P.2d 1354, 1362 (1994). However,

> the witness elimination factor only applies if: 1) the victim witnessed another crime and was killed to prevent testimony about that crime, 2) a statement by the defendant or other evidence of his state of mind shows witness elimination was a motive, or 3) some extraordinary circumstances show the murder was motivated by a desire to eliminate witnesses.

*Barreras,* 181 Ariz. at 523, 892 P.2d at 859.

■■■ The trial court found that the stabbings to the eyes of the victims and stompings were acts of gratuitous violence and mutilations, that the killings were senseless, that the victims were helpless, and that defendant was motivated by a desire to eliminate witnesses—the "young lives were snuffed out, as insects, merely to eliminate them as witnesses." In particular, the trial court noted in its special verdict that both victims were stabbed in the right eye—"gratuitous violence which, surely, could not have been calculated to lead to death." The stab wound to Mandy's eye penetrated to the bone, causing the eyeball to completely collapse. The eyelid was not punctured, leading the forensic examiner to conclude that Mandy was most likely unconscious during the stabbing. The court also found the stomping to be "unnecessary and gratuitous violence, designed to still the unconscious bodies and assuage the killers' discomfort from the reflexes of death." The court concluded, "The manner of killing and disposition of the bodies demonstrate an obdurate disregard for human life and human remains."

"The killing of a helpless child is senseless and demonstrates a disregard for human life satisfying two of the five *Gretzler* factors." *State v. Stanley,* 167 Ariz. 519, 528, 809 P.2d 944, 953, *cert. denied,* 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991); *see also Kiles,* 175 Ariz. at 373, 857 P.2d at 1227 ("The killing of two helpless children is senseless and demonstrates a total disregard for human life ... and is also evidence of a 'shockingly evil state of mind.'") (citations omitted). The two teenage girls were driven to a remote rural area in the middle of the night, sexually assaulted, stabbed, stomped, stripped, strangled, and thrown down a mine shaft. They were defenseless against the attacks, *see Kiles,* 175 Ariz. at 373, 857 P.2d at 1227, and suffered from gratuitous violence and needless mutilation.

In addition, defendant's statement to police revealed a motivation to eliminate the girls as witnesses. Defendant stated that his co-defendant proposed that the girls be killed because co-defendant had sexually assaulted them. The following dialogue occurred after defendant described the agreement to kill the girls:

> Defendant: He [Brazeal] said I'm gonna have to kill them. I said, "Why?" He said, "Well, I fucked this one and I fucked that one and they're gonna rat and they're gonna get you too."
>
> . . . .

Detective: What happened then, after that, after Randy told you that he wanted to kill them?

Defendant: He grabbed one and I had to grab the other one ... and I choked 'em.

Detective: Okay, you choked both of them?

Defendant: No. I didn't choke both of them. I got one and he got the other one ... And they wouldn't quit. It was terrible.

Detective: Okay, is that when you used the knife?

Defendant: Yup.

This dialogue shows witness elimination as a motivation, satisfying one of the three witness elimination factors. We have reviewed the entire record and affirm the findings of the trial court regarding the especially heinous and depraved nature of these crimes.

## IV. The Presentence Report

 Before referring to the specifics of the statutory and nonstatutory mitigating circumstances, we wish to comment on the presentence report in this case. Generally, the presentence report, prepared pursuant to Rule 26.4, Ariz.R.Crim.P., may be considered on matters of mitigation if it contains information favorable to the defendant. *State v. Scott,* 177 Ariz. 131, 145, 865 P.2d 792, 806 (1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 129, 130 L.Ed.2d 73 (1994); *State v. Rumsey,* 136 Ariz. 166, 171, 665 P.2d 48, 53 (1983), *aff'd,* 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). However, in this case, by stipulation of the parties in the trial court, the presentence report was sealed and defense counsel asked the trial court not to read it. In urging this procedure in the trial court, defendant's trial counsel argued that any mitigating evidence contained in the presentence report "can be adequately covered" by other exhibits and defense witnesses. Thus, pursuant to the stipulation and at the express request of defendant, the trial judge did not read the presentence report.

 At oral argument, however, defendant's appellate counsel urged us to review the presentence report. We do not approve of the practice of withholding information from the trial court and then presenting it to the appellate court. Counsel are encouraged to present all arguably mitigating evidence to the trial court and not to hold some back for appeal. If counsel is concerned that there is detrimental information in the presentence report that would only be appropriate to consider on the noncapital counts, one possible solution would be to proceed to sentencing on the capital counts first. Even without such precautions, however, trial judges know that, on the capital counts, they are limited to statutory aggravating factors properly admitted and proved beyond a reasonable doubt. A.R.S. § 13–703(C) (Supp.1994); *see Rumsey,* 136 Ariz. at 172, 665 P.2d at 54. They may not consider other evidence as aggravating. *See State v. Beaty,* 158 Ariz. 232, 246, 762 P.2d 519, 533 (1988) (judge presumed to apply proper standard), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989).

Consistent with our obligation in capital cases to independently weigh all potentially mitigating evidence, and pursuant to the request of defendant, we have examined and considered the presentence report that was withheld from the trial judge. Nothing in it persuades us that the trial court erred in imposing the death sentence. We turn, then, to a consideration of the mitigating factors.

## V. Statutory Mitigating Circumstances

 The sentencing judge must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether the death penalty should be imposed." *Kiles,* 175 Ariz. at 373, 857 P.2d at 1227 (internal quotations omitted). A defendant must prove mitigating factors by a preponderance of the evidence. *Greenway,* 170 Ariz. at 168, 823 P.2d at 35. The sentencing court must, of course, consider all evidence offered in mitigation, but is not required to accept such evidence. *State v. Ramirez,* 178 Ariz. 116, 131, 871 P.2d 237, 252, *cert. denied,* —— U.S. ——, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994).

Defendant raised only one statutory mitigating circumstance at sentencing:

A. Capacity to appreciate wrongfulness of conduct. A.R.S. § 13–703(G)(1) (1989).

On appeal, he raises additional statutory mitigating circumstances:

B. Relatively minor participation. A.R.S. § 13–703(G)(3) (1989).

C. No reasonable foreseeability that conduct would create grave risk of death to another. A.R.S. § 13–703(G)(4) (1989).

We address each in turn.

## A. Capacity to Appreciate Wrongfulness of Conduct or to Conform Conduct to Requirements of the Law

■ Defendant argues that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired for three reasons: alcohol consumption, earlier head injuries, and mental disorders. This factor is disjunctive, "so that proof of incapacity as to either ability to appreciate or conform establishes the mitigating circumstance." *State v. Wood,* 180 Ariz. 53, 70, 881 P.2d 1158, 1175 (1994).

### 1. Alcohol

■ Defendant argues that heavy consumption of alcohol seriously undermined "his ability to appreciate the stupidity and illegality of his conduct." Opening Brief at 37. Voluntary intoxication may be mitigating if the defendant proves by a preponderance of the evidence that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–703(G)(1); *see also Atwood,* 171 Ariz. at 650–51, 832 P.2d at 667–68.

■ There was evidence that defendant and co-defendant consumed alcohol on the day of the murders. James Robinson, who was present at the campsite the night of the crimes, testified that defendant consumed beer and whiskey that night, but that he was not so drunk that he could not maneuver himself. Roy Waters, age fifteen, testified that he saw defendant drinking beer in the afternoon and that he appeared drunk. Cory Rutherford, age thirteen, testified that he observed defendant drinking out of a bottle. Various witnesses testified that co-defendant Brazeal was drinking and appeared intoxicated, more so than defendant. At approximately 12:30 a.m. on the morning of the murders, defendant, accompanied by Brazeal, purchased a six-pack of Budweiser and a pint of Jim Beam. The morning after the campout, the owner of the site where the girls camped found an empty quart bottle of whiskey, an empty half pint bottle of whiskey, and an empty package of Budweiser, but these items were never tied to defendant. Based entirely on defendant's self-reported consumption and self-reported blackout on the night of the crimes, a clinical psychologist opined that defendant's capacity to appreciate the wrongfulness of his conduct was significantly impaired at the time of the incident.

However, there is much evidence showing defendant was not significantly impaired by alcohol at the time of the murders and did not suffer a blackout at the time of the crimes. Defendant disposed of the bodies and burned the clothing of the victims, thus showing that he knew the conduct was wrongful. *See Gallegos,* 178 Ariz. at 17, 870 P.2d at 1113; *Atwood,* 171 Ariz. at 651, 832 P.2d at 668. He was able to accurately guide the officers back to the crime scene. Defendant also had substantial recall of the events,[2] *see State v. Herrera,* 176 Ariz. 21, 33, 859 P.2d 131, 143, *cert. denied,* —— U.S. ——, 114 S.Ct. 398, 126 L.Ed.2d 346 (1993), and attempted to cover up the crimes, *see Salazar,* 173 Ariz. at 413, 844 P.2d at 580, causing the trial court to find that defendant's capacity to appreciate wrongfulness was not substantially impaired. *State v. Cook,* 170 Ariz.

2. For example, during the initial interview, defendant corrected the chronology of events:

 Detective: So, okay, you guys killed the girls and burned their clothes, threw them down the mine shaft.

 Defendant: Killed them. Threw them down the mine shaft. Burned their clothes.

40, 64, 821 P.2d 731, 755 (1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 137, 121 L.Ed.2d 90 (1992). "[S]tacked against the testimony offered in mitigation by defendant is the evidence that defendant *did know* that his ... conduct was wrongful." *Atwood*, 171 Ariz. at 651, 832 P.2d at 668.

We agree with the trial court that defendant failed to show that he was significantly impaired during the time of the crimes so as to meet the statutory mitigation requirements.

## 2. Head Injuries

■ Head injuries that lead to behavioral disorders may be considered a mitigating circumstance. *See State v. Rockwell*, 161 Ariz. 5, 15, 775 P.2d 1069, 1079 (1989). Evidence indicates that defendant suffered three head injuries since 1982. A neurologist who reviewed the medical records testified that defendant had suffered a compound depressed skull fracture, underwent surgery, and suffered permanent damage in 1982 from being hit with a heavy beer mug. In 1986, he struck his head on the pavement after jumping onto the hood of his wife's moving vehicle. About a year before the murders, he suffered a severe head injury when another wife hit him with a cast iron skillet. Other head injuries alleged by defendant were uncorroborated.

According to the neurologist, such injuries "could impair his ability to understand his environment, to interpret it correctly and to respond correctly to it," potentially manifesting in decreased control of impulsive behavior and decreased cognitive ability. Alcohol use increases any lack of control. The neurologist concluded that defendant's brain "integrity" was moderately to severely impaired due to previous brain or head injuries, resulting in impulsive behavior. A clinical psychologist said that defendant suffers from an inability to control impulse and that this problem is exacerbated by alcohol.

The trial court found: "Having suffered head injuries and having difficulty with impulse control sheds little light on defendant's conduct in this case. The evidence does not show defendant acted impulsively, only criminally, with evil motive." While we give more

mitigating weight to this element than did the trial court, it is substantially offset by the fact that defendant's test results showed that he has above average intelligence (an I.Q. of 128), and the facts show that he did not exhibit impulsive behavior in the commission of the crimes. *See Brewer*, 170 Ariz. at 505–06, 826 P.2d at 802–03. Defendant appreciated the wrongfulness of his conduct, *id.* at 506, 826 P.2d at 803, as evidenced the next day by his comment to the interrogating officer, "I ... choked 'em.... There was one foot moving though I knew they was brain dead but I was getting scared.... And they just wouldn't quit. It was terrible." His prior head injuries do not show that defendant was unable to conform or appreciate the wrongfulness of his conduct.

## 3. Mental Disorders

■ While a patient at a Texas hospital in 1971, defendant was diagnosed with a passive-aggressive personality. In 1978, he was re-admitted to the same hospital for psychotic depression. Defendant reported feeling suicidal, along with a fear that he might harm someone else. The final diagnosis of the second hospitalization was that defendant suffered from a personality disorder with differential to include passive-aggressive personality, antisocial personality, and borderline personality.

In a proceeding to determine defendant's competency to stand trial, a clinical psychologist found that defendant "does not appear to be suffering from any psychotic disorder but he has a history of depression and other serious psychological problems," including a pattern of impulsivity. Defendant's Trial Exhibit 24. Defendant also claimed to have attempted suicide twice. The psychologist testified that defendant suffered from a borderline personality disorder and depression. He concluded that defendant is a "seriously dysfunctional individual."

■ Character or personality disorders alone are generally not sufficient to find that defendant was significantly impaired. *Apelt*, 176 Ariz. at 377, 861 P.2d at 662. A mental disease or psychological defect usually must

exist before significant impairment is found. *Id.*

Despite this evidence, "[t]his case does not involve the same level of mental disease or psychological defects considered in other cases in which the § 13–703(G)(1) mitigating circumstance was found to exist." *Brewer,* 170 Ariz. at 505, 826 P.2d at 802. Defendant failed to show that his ability to control his actions was substantially impaired; his actions showed that he appreciated the wrongfulness of his conduct. Evidence showed that defendant was familiar with the mine shaft and discussed killing the girls with Brazeal. Defendant sexually assaulted Mandy, choked her and stomped on her body, and agreed that Mary should also be killed. Defendant then attempted to cover up the crimes by dumping the bodies in the mine shaft and burning the girls' clothes. "The record reveals that defendant made a conscious and knowing decision to murder the victim[s] and was fully aware of the wrongfulness of his actions." *Id.* at 506, 826 P.2d at 803. This evidence fails to meet the statutory burden by a preponderance of the evidence.

## B. Relatively Minor Participation

■ Defendant raises this argument for the first time on appeal. According to A.R.S. 13–703(G)(3), mitigation exists where the defendant shows that he was "legally accountable for the conduct of another ..., but his participation was relatively minor, although not so minor as to constitute a defense to prosecution." The argument consists of one sentence in the brief: "Given the overwhelming possibility that the jury's guilty verdict was based upon the felony murder theory, this factor should have been considered in mitigation." Opening Brief at 37. However, as we have previously noted, the trial court did not instruct the jury on felony murder. The jury found defendant guilty of two counts of first degree premeditated murder. Defendant brutally killed Mandy and intended that Mary be killed. His actions were substantial; we therefore reject this argument. *See Herrera,* 176 Ariz. at 20, 859 P.2d at 130.

## C. No Reasonable Foreseeability that Conduct Would Create Grave Risk of Death to Another

■ In an attempt to come within the ambit of A.R.S. § 13–703(G)(4), defendant argues for the first time on appeal that "[a]t the time this episode first began, it does not appear that any plan existed to cause harm or fatal injury to the victims." Opening Brief at 38. He cites no facts or evidence to support this argument. After a review of the entire record, we also find no facts or evidence to support this statutory mitigating circumstance. *See State v. Greenawalt,* 128 Ariz. 150, 173, 624 P.2d 828, 851, *cert. denied,* 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).

## VI. Nonstatutory Mitigating Circumstances

Nonstatutory mitigating factors raised at trial and discussed in the special verdict were:

1. historic substance abuse;
2. lack of prior felony record;
3. cooperation with police;
4. co-defendant Brazeal's twenty-year sentence;
5. leniency in sentencing;
6. ability to be rehabilitated;
7. difficulty in early years and prior home life;
8. mental condition and behavior disorders;
9. good character of defendant;
10. good behavior while incarcerated; and
11. lack of future dangerousness if confined to prison.

The trial court rejected all of these. The trial court also stated, "[T]his court is unable to glean any mitigating circumstances not suggested by [defendant's] counsel." In conclusion, the trial court found that even if any or all of the mitigating circumstances existed, "balanced against the aggravating circumstances found to exist, they would not be sufficiently substantial to call for leniency."

Additional nonstatutory mitigating circumstances raised on appeal are:

12. felony murder theory;

13. remorse; and
14. lack of evidence showing that defendant actually killed or intended to kill Mary.

As part of our independent review, we will address each alleged mitigating circumstance.

### 1. Historic Substance Abuse

 If impairment does not rise to the level of a statutory mitigating circumstance, the trial court should still consider whether such impairment constitutes nonstatutory mitigation, when viewed in light of defendant's alleged history of alcohol and drug abuse. *Gallegos,* 178 Ariz. at 17, 870 P.2d at 1113. Various relatives and acquaintances testified that defendant was an alcoholic and that he considered himself to be one. A clinical psychologist agreed with that assessment. Other acquaintances testified that they had seen defendant drunk before. Defendant claims to have consumed at least a pint of whiskey every day and to have used various illicit drugs in the past. In 1977, he was arrested twice for drunkenness; the cases were dismissed. Defendant was convicted of driving while intoxicated in 1986 and 1989. He was arrested in 1991 for driving under the influence of alcohol and the case was dismissed.

As we have recommended in past cases, the trial judge here was very thorough in considering the statutory and nonstatutory mitigating circumstances. *Gallegos,* 178 Ariz. at 22–23, 870 P.2d at 1118–19. With respect to the item of historic substance abuse, the trial court stated in its special verdict, "Alcohol abuse over an extended period of defendant's life, and his drinking at the time of the killings are not mitigating circumstances under the facts of this case." We have reviewed the entire record and agree with the trial court that defendant has failed to prove his alcohol or drug use is a nonstatutory mitigating factor.

### 2. Lack of Prior Felony Record

 Lack of prior felony convictions may constitute a nonstatutory mitigating circumstance. *Scott,* 177 Ariz. at 144, 865 P.2d at 805. However, "arrests or misdemeanor convictions may be considered when lack of felony convictions 'is advanced as a mitigating factor.'" *Id.* at 145, 865 P.2d at 806 (quoting *State v. Rossi,* 171 Ariz. 276, 279, 830 P.2d 797, 800, *cert. denied,* —— U.S. ——, 113 S.Ct. 610, 121 L.Ed.2d 544 (1992)).

 Although defendant has no prior felony conviction, he also does not have a law abiding past. He has a history of misdemeanor arrests and offenses including a conviction for disorderly conduct in 1973, two arrests for public drunkenness in 1977, and arrests for assaults on two former wives, one in 1978 and the other in 1986. Unlike the trial court, in our independent reweighing, we conclude that this thirty-eight year old defendant's lack of a felony record is a nonstatutory mitigating circumstance, but the weight to be given it is substantially reduced by his other past problems with the law. *See Scott,* 177 Ariz. at 144–45, 865 P.2d at 805–06; *Cook,* 170 Ariz. at 63 n. 12, 821 P.2d at 754 n. 12.

### 3. Cooperation with Police

 Defendant's cooperation with police followed an initial denial of any knowledge of the girls. He only confessed after hearing that co-defendant had been arrested. This does not constitute a mitigating circumstance. *State v. Spencer,* 176 Ariz. 36, 45, 859 P.2d 146, 155 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994); *Atwood,* 171 Ariz. at 653, 832 P.2d at 670.

### 4. Disparity of Co-defendant's Sentence

 Although sentences of co-defendants may be considered in mitigation, *Cook,* 170 Ariz. at 65, 821 P.2d at 756; *State v. Watson,* 129 Ariz. 60, 64, 628 P.2d 943, 947 (1981), where the difference in sentences is a result of appropriate plea bargaining, it may not be considered in mitigation. *State v. Gillies,* 142 Ariz. 564, 571, 691 P.2d 655, 662 (1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). "[I]t is not mere disparity between the two sentences that is significant, but, rather, unexplained disparity." *State v. Schurz,* 176 Ariz. 46, 57, 859 P.2d 156, 167, *cert. denied,* —— U.S. ——, 114 S.Ct. 640, 126 L.Ed.2d 598 (1993). Where the first degree murder is found especially cruel, heinous, or depraved, "even unexplained disparity has little significance."

*Id.* The sentence negotiated by co-defendant was the result of a disparity of evidence at the time of co-defendant's trial, causing the state to enter into a plea agreement. In addition, it must be remembered that co-defendant was twenty years old. *But see Walton*, 159 Ariz. at 589, 769 P.2d at 1035 (affirming death sentence of twenty year old defendant). Defendant was thirty-eight.

### 5. Leniency in Sentencing

■ The trial court correctly held that "the claimed right to leniency in the context of the alleged harshness and disproportionality of the death penalty is not a mitigating circumstance." Special Verdict at 8.

### 6. Prospect for Rehabilitation

■ Although a criminal justice consultant testified that defendant has the potential for rehabilitation, the trial court found such prospects slim. We agree with the trial court. After a long history of alcohol abuse and tumultuous behavior, defendant showed no evidence of ability to rehabilitate. *See Atwood*, 171 Ariz. at 654, 832 P.2d at 671 ("[D]efendant's interest in rehabilitation was insufficient to call for leniency when compared to the harm caused by his conduct and his continued threat to the public peace.").

### 7. Family History

■ According to a clinical psychologist, defendant had a chaotic and abusive childhood, never knowing his father and having been raised by various family members. A difficult family background alone is not a mitigating circumstance. *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied*, 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990). This can be a mitigating circumstance only "if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control." *Id.* Adult offenders have a more difficult burden because of the "greater degree of personal responsibility for their actions." *Gretzler*, 135 Ariz. at 58, 659 P.2d at 17.

Family history in this case does not warrant mitigation. Defendant was thirty-eight years old at the time of the murders. Although he may have had a difficult childhood and family life, he failed to show how this influenced his behavior on the night of the crimes. *See White*, 168 Ariz. at 513, 815 P.2d at 882.

### 8. Mental Condition and Behavior Disorders

■ Although this element was rejected by the trial court, we conclude, pursuant to our independent review, that defendant's documented mental disorders are entitled to some weight as nonstatutory mitigation. *See* discussion *supra* part V(A)(3) (statutory mitigation).

### 9. Good Character of Defendant

■ To impeach this alleged mitigating circumstance, the state called two former wives of defendant. Both testified that defendant had physically abused them, threatened them with death, and threatened that their bodies would be thrown down a mine shaft. Defendant failed to prove good character by a preponderance of the evidence.

### 10. Good Behavior while Incarcerated

■ Although long-term good behavior during post-sentence incarceration has been recognized as a possible mitigating factor, *Watson*, 129 Ariz. at 63–64, 628 P.2d at 946–47, we, like the trial court, reject it here for pretrial and presentence incarceration. *See State v. Lopez*, 175 Ariz. 407, 416, 857 P.2d 1261, 1270 (1993) ("[D]efendant would be expected to behave himself in county jail while awaiting [sentencing]."), *cert. denied*, — U.S. —, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).

### 11. Lack of Future Dangerousness if Confined to Prison

■ Although defendant presented some evidence that he would no longer be dangerous if confined to prison for life, we find that he fails to prove this by a preponderance of the evidence, particularly in view of his history of violence and threats of violence and his actions in this case.

### 12. Felony Murder Instruction

Defendant claims that a felony murder instruction was given and that this should be considered in mitigation. *See supra* part V(B) (statutory mitigation). However, there was no felony murder instruction.

**525**

### 13. Remorse

Although remorse may be considered in mitigation, *Brewer*, 170 Ariz. at 507, 826 P.2d at 804; *State v. Tittle*, 147 Ariz. 339, 344, 710 P.2d 449, 454 (1985), defendant failed to prove by a preponderance of the evidence that he was remorseful. A criminal justice consultant testified that defendant had feelings of remorse. In addition, during defendant's statement to the court prior to sentencing, defendant stated,

> I think it's very clever the way I have been made a scapegoat in this case. I do not deny culpability, but there was no premeditation on my part. What I am guilty of is being an irresponsible person for most of my life, running from responsibility, living in a fantasy world and it was my irresponsibility on the night that this incident occurred that involved·me in the incident. There is no words that can express the grief and the sorrow and the torment I have experienced over this, but I am just going to leave everything in the hands of God because that's where it is anyway.

Defendant's statement and the testimony of the consultant were inadequate to prove the mitigating circumstance by a preponderance of the evidence.

### 14. Lack of Evidence Showing that Defendant Actually Killed or Intended to Kill Mary

Although defendant claims that there was insufficient evidence to show that he killed or intended to kill Mary, the evidence, including his own statement to police, proves that he and Brazeal agreed that the girls must be killed. In his statement to the detective, defendant acknowledged the agreement to kill the girls and admitted stabbing both girls. Clearly, he was an active participant in the killing of both girls. The jury, in its guilty verdict, and the trial court, in its special verdict, so found. After a review of the entire record, we agree that defendant personally killed Mandy and, at the least, intended that Mary be killed.

### CONCLUSION

There are three statutory aggravating circumstances. There are no statutory mitigating circumstances. We have considered the nonstatutory mitigating factors·of lack of prior felony record and his mental condition and behavior disorders. We find the mitigation, at best, minimal. Certainly, there is no mitigating evidence sufficiently substantial to call for leniency. We have searched the record for fundamental error and found none. The convictions and sentences are affirmed.

Stanley G. Feldman, Chief Justice

Robert J. Corcoran, Justice

Thomas A. Zlaket, Justice

Frederick J. Martone, Justice